**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

Fred W. Holland, M.D.,                                    Case No. 3:18CV490

             Plaintiff

      v.                                                      **ORDER**

Mercy Health, et al.,

             Defendants

This is an employment-discrimination case under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*; the Civil Rights Act of 1866, 42 U.S.C. § 1981; similar state-law provisions; and Ohio tort law.

Plaintiff Fred Holland is a white cardiothoracic surgeon who worked at defendant Mercy Health St. Vincent Medical Center (St. Vincent's) in Toledo from 2013 through 2017.

He alleges that a group of Pakistani-born doctors at St. Vincent's, led by defendants Fayyaz Hashmi and Imran Andrabi, schemed to deprive him of patient referrals because he was white and not from Pakistan. Holland also claims that the defendants retaliated against him for opposing that scheme and filing a discrimination charge with the Ohio Civil Rights Commission. Finally, he alleges that defendants' conduct interfered with his then-current and prospective business opportunities and amounted to intentional infliction of emotional distress.

Pending is the defendants' motion for partial judgment on the pleadings. (Doc. 17). For the reasons that follow, I grant the motion in part with prejudice and in part without prejudice to the filing of a motion for leave to amend.

# Background

In December, 2012, defendants Mercy Health (Mercy) and St. Vincent's "hired Dr. Holland as a staff cardiothoracic surgeon" pursuant to a five-year contract. (Doc. 1 at ¶18).[1]

When his tenure at St. Vincent's began, in March, 2013, Holland was one of three cardiovascular surgeons on staff. (*Id.* at ¶¶27–28). The two other surgeons were James Burdine, who was white, and Dr. Hashmi. (*Id.* at ¶28). Because Dr. Burdine was less focused on patients with heart problems, Holland and Hashmi agreed to split "any patient consults that came through the hospital . . . evenly." (*Id.* at ¶30).

Holland's and Hashmi's relationship was initially cordial, but it soured when Holland discovered "Hashmi's glaringly deficient and sub-par surgical results." (*Id.* at ¶33).

According to Holland, those results included Hashmi's supposed responsibility "for two consecutive patient deaths [during] identical procedures within a 48 hour time period." (*Id.* at ¶35). Holland believes that defendant Andrabi, who was Mercy's CEO and Senior Vice President, knew that Hashmi was a bad surgeon but "protected" him because he was a "fellow Pakistani." (*Id.* at ¶33).[2]

Holland brought his concerns about Dr. Hashmi to St. Vincent's Chiefs of Surgery and Cardiology, as well as Dr. Burdine. (*Id.* at ¶36). But "no one wanted to challenge Hashmi and/or

---

[1] On paper, the parties' employment relationship reflected that Holland "entered into an employment agreement with the Toledo Clinic," which is not a party to this suit. Toledo Clinic, in turn, entered into a Service Agreement with St. Vincent's, under which Toledo Clinic agreed to provide Dr. Holland's services to the hospital. (*Id.* at ¶21). Defendants therefore deny that they, in fact, employed Holland, but recognize that this issue requires further development of the record. (Doc. 17 at 9 n.1).

[2] Holland devotes a great deal of his complaint – at least 33 of the 140 paragraphs in the "Facts" section – to detailing Hashmi's alleged inadequacies as a surgeon, Holland's efforts to alert his superiors to those deficiencies, and Mercy's alleged failure to "protect" its patients from Hashmi. As those allegations have little bearing on my decision, I do not describe them in any great detail.

Andrabi" because "'the Pakistanis' ran . . . St. Vincent's to the exclusion of others" and "they were deemed untouchable." (*Id.* at ¶¶37–38).

## A. Loss of Patient Referrals

Close on the heels of Holland's complaint, Hashmi directed hospital staff to give patient referrals "directly to [him] rather than page them out of the surgeon on call, as was the usual policy and practice." (Doc. 1 at ¶40). This resulted in Dr. Holland seeing fewer patients.

Hashmi also conspired with his brother Raza Hashmi, "a cardiologist who controls a significant amount of cardiology services at Mercy," and Ameer Kabour, the head of cardiology, "to cause business to be provided to [Hashmi] to the exclusion of superior physicians including Dr. Holland and others not of Pakistani descent." (*Id.* at ¶44; *see also id.* at ¶74 (Hashmi's "scheme . . . resulted in another non-Pakistani physician also being denied referrals")).

Dr. Burdine reminded Hashmi that he and Holland were to split the referrals evenly, but "Hashmi continued to . . . direct almost all patient consults directly to himself." (*Id.* at ¶41). Hashmi acted "without fear of reprisal . . . because of his close relationship with Andrabi." (*Id.* at ¶42; *see also id.* at ¶49 ("Hashmi continued to control patient [referrals] . . . with Andrabi continuing to protect him . . . to the discriminatory exclusion of [Holland] and other non-Pakistani physicians")).

In January, 2014, Dr. Holland met with Tom Arquila, the CEO of St. Vincent's, and Scott Porterfield, the CEO of the Toledo Clinic, "to address various issues including quality concerns pertaining to Hashmi and the skewed referrals." (*Id.* at ¶45). Holland does not allege that he told either Arquila or Porterfield that Hashmi refused to refer patients to Holland because Holland was white or not of Pakistani origin. (*Id.*).

Arquila, who reported directly to Andrabi, responded that if Dr. Holland were unhappy, "'they' would be happy to serve as a reference for him." (*Id.* at ¶47). Holland understood this as a warning that he should stop complaining "or else he would find himself in need of new employment." (*Id.*). Porterfield eventually apologized for "how poorly [Holland] had been treated by Defendants," but "took no action to remedy the discrimination." (*Id.* at ¶52).

### B. Transfer to St. Anne's

In July or August, 2014, Holland became the chief cardiothoracic surgeon at a different Mercy hospital, St. Anne's. (Doc. 1 at ¶¶54–55). Hashmi tried to prevent the appointment but was unsuccessful because "'the Pakistanis' did not directly control St. Anne's." (*Id.* at ¶57).

Shortly after Dr. Holland took over at St. Anne's, he received data from the Society of Thoracic Surgeons showing, essentially, that Dr. Hashmi's patients died at a much higher rate than either Holland's or the national average. (*Id.* at ¶¶62–68). Nevertheless, "Hashmi continued to receive a majority of the cardiothoracic cases" at Mercy "while Dr. Holland and another non-Pakistani physician were . . . being frozen out[.]" (*Id.* at ¶69).

### C. Contract Talks

In May, 2015, Porterfield told Holland that "Arquila intended to renew [his] contract upon its expiration in 2017." (Doc. 1 at ¶71).

According to Holland, however, Hashmi and Andrabi continued their scheme to deprive him of patient referrals so that, "when it came time to renew [the contract], there would not be sufficient work to justify it[.]" (*Id.* at ¶75).

For one thing, in September, 2016, Hashmi and Andrabi caused Mercy to hire, over Holland's objection, Dr. Sulaiman Hasan, "a Pakistani cardiothoracic surgeon" who had "attended the same medical school in Pakistan" as Hashmi and Andrabi. (*Id.* at ¶¶76–78, 80). For

another, Mercy continued to allow Hashmi to "control the assignment of [patient] referrals . . . despite his incomprehensibly high mortality statistics[.]" (*Id.* at ¶81).

In November, 2016, some two months after Hasan's hiring, Arquila advised Toledo Clinic that it "inten[ded] to terminate [Dr. Holland's] Service Agreement, without cause, effective February 28, 2017." (*Id.* at ¶82).

These issues notwithstanding, Holland and Mercy began, in January, 2017, to negotiate the terms of a "call agreement." Under this agreement, Holland would act as "a back up surgeon [who was] available to perform surgeries [when] the primary surgeon [wa]s not available." (Doc. 1 at ¶¶89–90).

However, the "[d]efendants demanded that Dr. Holland reduce his income from roughly $730,000 per year to $120,000 per year" (*id.* at ¶91), and the parties never executed this contract.

### D. Charge, Retaliation, and Resignation

Holland filed a discrimination charge with the Ohio Civil Rights Commission (OCRC) on February 25, 2017. (Doc. 1 at ¶97; Doc. 17–1). When Andrabi learned of the charge a few days later, he retaliated against Holland by: 1) "caus[ing] Dr. Holland's surgical first assistant to be stripped from him"; and 2) causing "the call agreement not to be signed." (Doc. 1 at ¶¶104–07).

During a meeting several weeks later with the CEO of St. Anne's, Holland "was advised that Arquila refused to sign the call agreement specifically because [he] had filed a charge of discrimination against Defendants." (*Id.* at ¶111). He also learned that "his medical director position was not being continued." (*Id.* at ¶112).

While meeting with Porterfield in May, 2017, Holland also discovered that: 1) "his quality was irrelevant to determining who obtained referrals"; 2) "certain individuals associated with Defendants wanted to offer him a contract, but . . . were prohibited because of his

discrimination [charge]"; 3) Arquila was responsible for revoking the call agreement; and 4) the defendants would not offer him a new contract unless he agreed to arbitrate or mediate his claims. (*Id.* at ¶¶120–23).

Sometime in July, 2017, Holland brought his allegations of discrimination and Hashmi's malpractice to the interim CEO of Mercy. The company responded by having its attorney, Thomas Wienceck (who represents the defendants in this litigation), "dissuade" Holland from pursuing his discrimination complaints. (*Id.* at ¶¶127–28). Wienceck did this by "defaming" Holland, "threatening to sue" him, and "demanding that Dr. Holland take action that would be inconsistent with the Hippocratic Oath[.]" (*Id.* at ¶133).

Holland resigned in December, 2017, because "Defendants thwarted his ability to properly practice medicine." (*Id.* at ¶140). He filed this suit in March, 2018.

## Standard of Review

"After the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c).

In reviewing a Rule 12(c) motion, "all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment as a matter of law." *Hindel v. Husted*, 875 F.3d 344, 346 (6th Cir. 2017) (internal brackets and quotation marks omitted).

## Discussion

The defendants have moved for judgment on the pleadings as to all of Holland's claims except the state and federal claims of national-origin discrimination, and a retaliation claim based on Holland's filing of an OCRC charge, against Mercy and St. Vincent's. (Doc. 17 at 1).

## A. Race Discrimination Under Title VII and Ohio Law

Title VII makes it "unlawful . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

In Count I of the complaint, Holland alleges that "Defendants' conduct described [in the complaint] constitutes . . . racial discrimination in violation of Title VII. (Doc. 1 at ¶142). He makes similar allegations in Count VI, which invokes Ohio's analogue to Title VII, O.R.C. § 4112.01, *et seq.* (Doc. 1 at ¶¶186–90).

Defendants argue that Holland has not plausibly alleged that his race was a motivating factor in the adverse employment actions at issue. (Doc. 28 at 7). Rather, defendants contend that the substance of the complaint establishes "Dr. Holland's belief that he was treated unfairly because he is not of Pakistani national origin," not because he is white. (Doc. 17 at 12). On this score defendants observe that Holland's lengthy and detailed 214-paragraph complaint refers just twice to his race. (Doc. 1 at ¶¶163–64).

In response, Holland argues that he pleaded "numerous facts that establish he was discriminated against because of his race and/or national origin." (Doc. 21 at 9–10).

To support that contention, he points to allegations that he is "white and/or white American," while Hashmi and Andrabi are "Pakistani" and "not white" or "white American." (*Id.* at 10). Holland then cites other paragraphs of his complaint that supposedly "substantiate his claims that Andrabi, Hashmi and other Pakistanis . . . participated in discriminatory conduct towards he [*sic*] and other white people or white Americans." (*Id.*) (citing ¶¶37–38, 41–50, 64–69, and 75–82 of the complaint).

I agree that Holland has not alleged a plausible race-discrimination claim. To the contrary, the complaint repeatedly alleges that Hashmi and Andrabi, as the Pakistanis who "ran" St. Vincent's, discriminated against Holland because he was not of Pakistani origin. The complaint charges, for example, that:

- "it was openly discussed at . . . St. Vincent that 'the Pakistanis' ran . . . St. Vincent's to the exclusion of others" (Doc. 1 at ¶38).

- the defendants conspired "to cause business to be provided to [Hashmi] to the exclusion of superior physicians including Dr. Holland and others not of Pakistani descent." (*Id.* at ¶44).

- Andrabi protected Hashmi from management "to the discriminatory exclusion of Dr. Holland and other non-Pakistani physicians." (*Id.* at ¶49).

- Andrabi and Hashmi's scheme "resulted in another non-Pakistani physician also being denied referrals." (*Id.* at ¶74).

In contrast, there are no allegations that Holland's race similarly motivated Hashmi, Andrabi, or the entity defendants to discriminate against him.

Moving away from the allegations in the complaint, Holland relies on Equal Employment Opportunity Commission enforcement guidelines for the proposition that "national origin discrimination often overlaps with" racial discrimination "because a national origin group may be associated with a particular race." (Doc. 21 at 8)

But that principle has no application here.

As my colleague, District Judge Sara Lioi, explained in *Burrage v. Fedex Freight, Inc.*, 2012 WL 6732005, *4 n.2 (N.D. Ohio 2012), this theory applies "where an employee is subject to discrimination but, due to overlap between race and ethnicity, the employee cannot determine whether it is his membership in a racial category versus his national origin that is the impetus for the discrimination."

Holland's complaint, however, makes clear that it was his national origin, not his race, that was the impetus for the alleged discrimination.

Finally, and for essentially the same reason, there is no merit to Holland's contention that he was a victim of "'intersectional discrimination' that occurs when a person is discriminated against because of the combination of two or more protected bases[.]" (Doc. 21 at 9).

There is simply no hint in the complaint that Hashmi, Andrabi, and the Mercy defendants discriminated against Holland because he was both white and not from Pakistan, as opposed to being non-Pakistani. *Cf. Burrage*, *supra*, 2012 WL 6732005 at *4 ("[R]ace and national origin discrimination are ideologically distinct under Title VII.") (internal quotation marks omitted).

For these reasons, and because courts apply the same legal standards to Title VII and § 4112 claims, *Colston v. Cleveland Pub. Library*, 522 F. App'x 332, 336 (6th Cir. 2013), defendants are entitled to judgment as a matter of law on the race-discrimination claims in Counts I and VI.

**B. Hostile Work Environment**

Title VII also protects employees "from a workplace that is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Daniels v. Pike Cnty. Comm'rs*, 706 F. App'x 281, 287 (6th Cir. 2017).

To make out a hostile-work-environment claim, the plaintiff must establish that "(1) [he] belongs to a protected class; (2) [he] was subject to unwelcome harassment; (3) the harassment was based on [race or national origin]; (4) the harassment affected a term, condition or privilege of employment; and (5) the defendant knew or should have known about the harassment and failed to take action." *Phillips v. UAW Int'l*, 854 F.3d 323, 327 (6th Cir. 2017).

Whether a hostile-work-environment claim is plausible depends on "the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with an employee's performance." *Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 309 (6th Cir. 2016) (internal quotation marks and bracket omitted).

The Sixth Circuit "has established a relatively high bar for what amounts to actionable discriminatory conduct under a hostile work environment theory." *Phillips*, *supra*, 854 F.3d at 328.

Defendants argue that Holland's claim is implausible because it comprises a series of "discrete acts of alleged discrimination," rather than longstanding or widespread harassment based on his race or national origin. To support this argument, defendants rely on *Hunter v. Sec'y of U.S. Army*, 565 F.3d 986 (6th Cir. 2009).

The plaintiff in that case brought a Title VII claim based on "the repeated denial of promotion and training opportunities" over a thirteen-year period. *Id.* at 992. Although plaintiff styled the claim as one involving a hostile work environment, the Circuit held that "[t]he failure to promote an employee or select him for a training program is a discrete act that cannot alone amount to a hostile work environment." *Id.* at 994. Rather, such claims must "involve repeated conduct," and they require the plaintiff to produce evidence that "the workplace is permeated with discriminatory intimidation[,]" something that the plaintiff had not done. *Id.*

Dr. Holland argues that his claim is plausible because it rests on "a long term scheme beginning in 2013 and executed over several years . . . to direct referrals based on race and/or national origin[.]" (Doc. 21 at 15). According to Holland, this scheme "occurred over time – and not on any particular day, but instead on every day[.]" (*Id.*) (emphasis in original).

Even accepting Holland's allegations as true, they do not state a plausible hostile-work-environment claim.

Hostile-work-environment claims involve severe and/or longstanding harassment of the plaintiff that does not necessarily result in "economic or tangible discrimination" – a demotion, for example, or reduced salary or responsibilities – but is nevertheless sufficiently "pervasive to alter the conditions of the victim's employment[.]" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). Stated another way, while the plaintiff retains his or her title, salary, and job duties, the harassment he or she experiences is so intense or widespread to alter, on a de facto basis, the terms and conditions of his or her employment.

Holland's claim does not fit within this rubric, however, because he does not allege severe or pervasive harassment that characterizes hostile-work-environment claims.

Rather, Holland's claim comprises discrete instances of economic or tangible discrimination: the loss of patient referrals and his status as St. Anne's medical director, the termination or non-renewal of two contracts, and the stripping of his surgical assistant. This kind of conduct is actionable on its own and, indeed, forms the basis for Holland's discrimination claims in Counts I and VI. But Holland cannot aggregate these adverse employment actions into a claim of race- or national-origin-based harassment. *See Hunter*, *supra*, 565 F.3d at 994.

In any event, even viewing Holland's claim as a traditional harassment claim, it does not clear the "relatively high bar" that the Sixth Circuit has erected. *Phillips*, *supra*, 854 F.3d at 328.

Holland has alleged that the defendants deprived him of business, interfered with the renewal of his contract, prevented him from obtaining a new contract, and made it harder for him to do his job (without a surgical assistant). But all of these incidents occurred over a nearly five-

year period, none of the defendants used derogatory or offensive language with him, and no one "physically threaten[ed]" him. *Smith*, *supra*, 813 F.3d at 309.

This is not the kind of conduct that amounts to a hostile work environment under Sixth Circuit precedent. *E.g.*, *Smith*, *supra*, 813 F.3d at 310 (affirming jury verdict for plaintiff where coworker inappropriately touched plaintiff three times within "a few months"); *Phillips*, *supra*, 854 F.3d at 328 (four racially motivated comments, and a supervisor's rejection of complaints from subordinates because the subordinates were African-American employees, amounted to "a handful of offensive comments and an offensive meeting over a two-year period," not a hostile work environment); *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 707–08 (6th Cir. 2007) (claim based on fifteen racially-motivated comments and further instances of disparate treatment over two-year period involved isolated rather than widespread incidents).

Holland tries to explain away the absence of the more traditional types of harassment by pointing out that he worked in the supposedly refined corridors of a hospital, rather than "a bar or garage or some other place where discrimination often takes the form of crude jokes and bullying." (Doc. 21 at 16). But the defect in Holland's claim is not the locus of his employment; it is that the claim consists only of discrete instances of tangible or economic discrimination, rather than widespread harassment.

Finally, to the extent that Holland's claim rests on his "being caused significant despair . . . because patients were needlessly dying" (*id.* at 17), there are no allegations that the defendants allowed patients to die and forced Holland to witness this because Holland was not white or Pakistani

For these reasons, defendants are entitled to judgment as a matter of law on the harassment claims in Counts I and VI.

## C. Retaliation

Title VII also forbids employers to retaliate against an employee "because he has opposed any practice made an unlawful employment practice" by Title VII. 42 U.S.C. § 2000e-3(a). Ohio law likewise prohibits retaliatory employment practices. *See* O.R.C. § 4112.02(1).

To make out a prima facie case of retaliation, the plaintiff must establish that "(1) [he] engaged in activity protected under Title VII; (2) the exercise of plaintiff's protected rights was known to the defendant; (3) the defendant subsequently took an adverse employment action against the employee[;] and (4) there was a causal connection between the protected activity and the adverse employment action[.]" *DePalma v. Sec'y of Air Force*, --- F. App'x ----, 2018 WL 5304814, *6 (6th Cir. 2018) (Title VII); *Coch v. Gem Indus.*, 2005-Ohio-3045, ¶27 (Ohio App. 2005) (Ohio law).

Defendants challenge Holland's retaliation claim on the ground that he did not engage in protected "opposition" activity. According to the defense, Holland never complained about discrimination that violated Title VII. (Doc. 17 at 20). Rather, Holland complained "only about the quality of Dr. Hashmi's work and the alleged inequity of patient consults to him and Dr. Hashmi." (*Id.*).

In response, Holland contends that he "pled numerous instances of retaliation, including in direct response to his opposition activity." (Doc. 21 at 19). He cites paragraphs 33–44, 71–76, and 82–84 of the complaint to establish that he "opposed the discriminatory practice in 2014" and "opposed the discriminatory hiring of Dr. Hasan," in July or August, 2014. (*Id.*).

"Protected activity refers to opposing any practice made unlawful under Title VII," *Scott v. Potter*, 182 F. App'x 521, 524 (6th Cir. 2006), and the statute "does not restrict the manner or

means by which an employee may oppose an unlawful employment practice." *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634 (6th Cir. 2015).

But the plaintiff must have "communicated a demand that a supervisor cease activity made unlawful by Title VII." *Crawford v. Chipotle Mexican Grill*, 2017 WL 4270504, *6 (S.D. Ohio 2017). If the plaintiff makes only "a vague charge of discrimination," however, he does not engage in protected activity. *Id.*

Here, Holland failed to allege that he complained about illegal race or national-origin discrimination.

Rather, the complaint alleges that "he raised his concerns about the[ patient] deaths" that Hashmi allegedly caused. (Doc. 1 at ¶36; *see also id.* at ¶45 (meeting with supervisors to "address various issues including quality concerns pertaining to Hashmi and the skewed referrals")). Nowhere does Holland say that he told his superiors that he believed the skewed referrals or Dr. Hasan's hiring were forms of discrimination. (*Id.* at ¶79) (alleging that Holland opposed Hasan's hiring, but not specifying the basis for the opposition).

Accordingly, defendants are entitled to judgment as a matter of law on the opposition claims in Counts II and VI.

### D. Hashmi's and Andrabi's Liability Under Title VII and O.R.C. § 4112.01

Dr. Holland purports to bring his Title VII claims directly against Hashmi and Andrabi, in addition to the entity defendants. (Doc. 1 at ¶¶8, 141–58).

These claims fail as a matter of law, however, because Title VII makes only "employers," rather than individual employees, liable, and there are no allegations that Hashmi and Andrabi were Holland's employers. *Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 404 (6th Cir. 1997).

But individuals may be liable for employment discrimination under Ohio law, provided that they qualify as "supervisors" or "managers." *Genaro v. Cent. Transp., Inc.*, 84 Ohio St. 3d 293, syll. ¶1 (1999).

"Although the Ohio Supreme Court has not defined 'supervisor' for the purposes of Chapter 4112 liability," district courts within our Circuit have relied on *Vance v. Ball State Univ.*, 570 U.S. 421 (2013) – which defines a "supervisor" for purposes of Title VII harassment claims – "to determine whether an individual constituted a supervisor[.]" *Ault v. Oberlin Coll.*, 2014 WL 4245991, *12 (N.D. Ohio 2014) (Vecchiarelli, J.), *aff'd in part and rev'd in part on other grounds*, 620 F. App'x 395 (6th Cir. 2015).

The parties here cite *Vance* in their briefs, so I will assume that it controls.

Under *Vance*, *supra*, 570 U.S. at 424, 431, a "supervisor" is "empowered by the employer to take tangible employment actions against the victim," which means "to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."

Defendants argue that the individual-capacity claims are implausible because Holland did not allege that Hashmi and Andrabi "had the authority to take tangible employment actions against him." (Doc. 28 at 16). Rather, defendants contend that the complaint establishes that Holland's supervisors were Arquila, the CEO of St. Vincent's – who cancelled the Service Agreement, terminated his position as St. Anne's Medical Director, and "pulled" the call agreement – and a Dr. Phillips, to whom Holland admittedly "reported." (Doc. 1 at ¶24.e).

Dr. Holland responds that he plausibly alleged that "Andrabi was running the show as 'the' supervisor and manager, as he was Mercy's CEO and Senior Vice President." (Doc. 21 at 28).

Holland points out that he alleged that Andrabi "had supervisory control of Holland's direct supervisor, Arquila," which created a workplace where "Andrabi could issue an order resulting in a material change in [Holland's] employment." (*Id.*). Finally, he argues that the complaint establishes that Hashmi "exercised his power to Dr. Holland's great financial detriment." (*Id.*).

I disagree and hold that neither Hashmi nor Andrabi qualifies as a supervisor or manager.

Most importantly, there are no non-conclusory allegations that either defendant could fire, demote, or reassign Holland or cause a significant change in his benefits. To the contrary, the complaint establishes that it was Arquila who had these powers.

Furthermore, the bare fact that Andrabi was Mercy's CEO does not yield a plausible inference that he "had supervisory and managerial control" over Holland. (Doc. 21 at 28). Without knowing more about Andrabi's actual power over Mercy's workforce, and with no allegations in the complaint that he ever "effect[ed] a significant change in [Holland's] employment status," only by speculating could I conclude that Mercy empowered him to do so. *Vance*, *supra*, 570 U.S. at 431.

Finally, that Hashmi allegedly deprived Holland of referrals is not sufficient to make him a supervisor. The complaint tends to show that Holland and Hashmi were peers. (Doc. 1 at ¶¶29– 31). When Hashmi first tried to interfere with Holland's referrals, Dr. Burdine, the third cardiothoracic surgeon in the practice group, upbraided him. (*Id.* at ¶41). Nowhere does Holland

allege that Hashmi could have fired him, reassigned him to another role, or otherwise take tangible employment action against him.

For these reasons, Hashmi and Andrabi are entitled to judgment as a matter of law on the individual-capacity claims in Count VI.

### E. Section 1981

The Civil Rights Act of 1866 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts[.]" 42 U.S.C. § 1981.

"To state a claim under § 1981, a plaintiff must plead . . . that he belongs to an identifiable class of persons who are subject to discrimination based on their race and that the defendant intended to discriminate against him on the basis of race." *Moniz v. Cox*, 512 F. App'x 495, 500 (6th Cir. 2013) (internal quotation marks omitted).

Dr. Holland invokes § 1981 in Count III of the complaint, where he alleges that the defendants "took intentional and deliberate acts to interfere with [his] enforcement of his existing contract, and interfered with his ability to enter into a prospective contract." (Doc. 1 at ¶162). Defendants did so, according to Holland, "because he is white and not Pakistani." (*Id.* at ¶¶163–64).

Defendants argue that this claim is conclusory because "there are no supporting factual allegations explaining how [Holland's] race (white) factored into Defendants' decisions regarding the Service Agreement or call agreement." (Doc. 17 at 23).

Defendants also contend that Holland has not plausibly alleged that they discriminated against him "'based on ancestry or ethnic characteristics.'" (*Id.* at 24) (quoting *St. Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987)). While defendants recognize that such discrimination

is cognizable under § 1981, they maintain that discrimination against Holland "because he is not Pakistani is a far cry from discriminating against [him] because of his race as manifested by his ancestry or ethnic characteristics." (*Id.* at 25).

Holland responds that he "properly pled he was discriminated against because of his race (white)." (Doc. 21 at 23). He also contends that he "pled specific facts" establishing how "his race factored into Defendants'" termination of his Service Agreement and the non-execution of the call agreement. (*Id.* at 24).

I disagree and hold that Holland's § 1981 is conclusory.

As was true of Holland's race-discrimination claims under Title VII and Ohio law, there are no non-conclusory allegations showing that defendants interfered with Holland's contractual rights on account of his race. *Sam Han v. Univ. of Dayton*, 541 F. App'x 622, 626–27 (6th Cir. 2013) (affirming the dismissal of an almost identical § 1981 as impermissibly conclusory). Rather, the complaint tends to establish that any such interference was owing to Holland not being of Pakistani extraction. But discrimination based solely on national origin is not actionable under § 1981. *St. Francis Coll.*, *supra*, 481 U.S. at 613.

Nor does the complaint provide a plausible basis – or, indeed, any basis – for concluding that Holland's ancestry or ethnic characteristics motivated the defendants' behavior. The complaint is silent as to Dr. Holland's ancestry and ethnic characteristics.

For these reasons, defendants are entitled to judgment as a matter of law on the § 1981 claim in Count III.

### F. Tortious Interference

Under Ohio law, the elements of tortious interference with contract are: 1) the existence of a contract; 2) the defendants' knowledge of the contract; 3) the defendant's intentional

procurement of the contract's breach; 4) lack of justification; and 5) damages. *Wylie & Sons Landscaping, LLC v. FedEx Ground Package Sys., Inc.*, 696 F. App'x 717, 723 (6th Cir. 2017).

The elements of tortious interference with business relations are the same, except that the third element requires the plaintiff to prove that "the wrongdoer intentionally and improperly acted to prevent a contract formation, procure a contractual breach, or terminate a business relationship." *Office Depot, Inc. v. Impact Office Prods., LLC*, 821 F. Supp. 2d 912, 924 (N.D. Ohio 2011) (Oliver, J.).

In Count IV of the complaint, Holland alleges that the defendants "intentionally procured the breach" of his "existing contract with Toledo Clinic." (Doc. 1 at ¶¶170, 172). Count V alleges that the defendants similarly "interfered" with Holland's "business relationship with Toledo Clinic" and "caus[ed] a breach and/or termination of that relationship, and prevent[ed] it from being properly continued." (*Id.* at ¶¶179, 181).

Defendants argue that these claims are implausible, the former because it does not allege "how Dr. Holland's employment agreement with the Toledo Clinic was breached" or "how the Defendants procured the alleged breach[,]" and the latter because Holland failed to allege "how Defendants interfered with or caused the alleged breach of [his] Toledo Clinic employment agreement[.]" (Doc. 17 at 27–28).

Dr. Holland's opposition brief shifts the focus from his contract and business relationship with Toledo Clinic to the Service Agreement, under which Toledo Clinic provided Holland's services to the Mercy defendants. (Doc. 21 at 25). He contends that the defendants procured the breach of this contract, and interfered with its renewal, by scheming to deny him patient referrals. (*Id.* at 25). Regarding the business-opportunities claim, Holland argues that the defendants "caus[ed his] call agreement not to be executed." (*Id.* at 26).

I agree with the defendants that Holland has not stated a plausible claim of tortious interference with contract or business relations.

Indeed, his opposition brief does not even address the plausibility of those claims *vis-à-vis* his contract with Toledo Clinic. Holland instead attempts to amend his complaint via his opposition brief, where he argues that the defendants interfered with a different contract, the Service Agreement between Toledo Clinic and Mercy. I will not consider those arguments here, because a party may not use an opposition brief to amend its complaint. *Brown v. Whirlpool Corp.*, 996 F. Supp. 2d 623, 645 (N.D. Ohio 2014) (Carr, J.).

For these reasons, defendants are entitled to judgment as a matter of law on the claims in Counts IV and V.

## G. Whistleblower Statute

Ohio's whistleblower statute, O.R.C. § 4113.52, creates a "procedure for an employee to follow if the employee becomes aware of a violation of any state or federal statute, ordinance or regulation, work rule or company policy, that the employee reasonably believes is a criminal offense, or is likely to cause an imminent risk of physical harm to persons or a hazard to public health or safety, or is a felony." *Keehan v. Certech, Inc.*, 2015 WL 8483179, *3 (N.D. Ohio 2015) (Lioi, J.).

The statute requires the employee to "orally notify the employee's supervisor . . . of the violation and subsequently . . . file with that supervisor . . . a written report that provides sufficient detail to identify and describe the violation." O.R.C. § 4113.52(A)(1)(a). Within twenty-four hours, the employer must "notify the employee, in writing, of any effort of the employer to correct the alleged violation or hazard[.]" *Id.*

An employer may not "take any disciplinary or retaliatory action against an employee for making any report authorized" by the law. O.R.C. § 4113.52(B).

Holland alleges that defendants violated the whistleblower statute in two ways.

First, he claims that, after he alerted his superiors that Hashmi and Andrabi "recklessly caused" the deaths of "numerous patient[s]," the defendants "repeatedly failed to provide . . . written notice" of their efforts to correct the issue or, indeed, to take any corrective action at all. (Doc. 1 at ¶¶198–201, 203).

Second, he claims that defendants retaliated against him for making such reports by "withholding salary and/or salary increases, employee benefits, denying Dr. Holland full employment, reducing Dr. Holland's pay and/or position and taken [*sic*] other action designed to interfere with Dr. Holland's ability to practice medicine, including interference with his referrals." (*Id.* at ¶205).

### 1. Timeliness

Whistleblower claims are subject to a 180-day statute of limitations that runs from "the date the disciplinary or retaliatory action was taken." O.R.C. § 4113.52(D).

Defendants argue that Holland failed to file his claim within 180 days of the last retaliatory adverse employment action. (Doc. 17 at 29). They note that Holland alleges he was "constructively discharged" on November 28, 2016, and that he was "terminated" on March 17, 2017. (*Id.*) (citing Doc. 1 at ¶¶82–82, 109, 111–13). Because Holland did not sue until March, 2018, defendants contend the claim is untimely.

Holland responds that his claim is timely because he filed it within 180 days of his resignation. (Doc. 21 at 29–30). In the complaint, Holland alleges that he resigned on December

30, 2017 because the defendants had "thwarted his ability to properly practice medicine, constructively discharging him." (Doc. 1 at ¶140).

I agree with Holland that the claim is timely because he brought it within 180 days of his resignation.

To be sure, Holland also alleged that certain actions the defendants took amounted to a constructive discharge or effectively terminated him. But those allegations are legal conclusions that I need not accept.

Moreover, a constructive discharge is not complete until the employee resigns. *See Green v. Brennan*, --- U.S. ---, 136 S. Ct. 1769, 1780 (2016). For that reason, at least with respect to federal antidiscrimination law, the statute of limitations for a constructive-discharge claim does not begin to run until the employee gives notice of his resignation. *Id.* at 1782.

Because Holland brought his whistleblower claim within 180 days of his December, 2017 resignation, the claim is timely.

## 2. Strict Compliance

"In order for an employee to be afforded protection as a 'whistleblower,' such employee must strictly comply with the dictates of R.C. 4113.52. Failure to do so prevents the employee from claiming the protections embodied in the statute." *Kulch v. Structural Fibers, Inc.*, 78 Ohio St. 3d 134, 153 (1997).

As noted above, the statute requires that, once the employee makes an oral complaint to his supervisor, he must submit a written report to the same supervisor. Defendants argue that Holland failed to comply with this requirement. (Doc. 17 at 31–31). According to the complaint, Holland orally complained about Dr. Hashmi to St. Vincent's Chiefs of Cardiology and Surgery,

as well as Dr. Burdine and Arquila. However, Holland sent his written reports to different individuals: St. Anne's Chief of Cardiology, Andrabi, and an interim CEO named Jeff Dempsey.

Holland's opposition brief does not address this argument.

Rather, Holland tries to shift the focus from the whistleblowing he pleaded in the complaint – his report that Hashmi and Andrabi had reckless caused numerous patient deaths – to a different kind of whistleblowing: his filing of an ODRC charge and complaints about "ongoing discrimination and retaliation. (Doc. 21 at 30–31).

I decline to consider those arguments here, *Brown*, *supra*, 996 F. Supp. 2d at 645, and hold that Holland did not comply with the whistleblower statute. *Haney v. Chrysler Corp.*, 121 Ohio App. 3d 137, 139 (1997) (employee who made oral report to one supervisor and written report to a different supervisor did not comply with the statute). Defendants are therefore entitled to judgment as a matter of law on the claims in Count VII.

### 3. Hashmi's and Andrabi's Liability

Finally, while Holland has brought his whistleblower claim against all defendants, the statute does not make individuals like Hashmi and Andrabi liable. *Keehan v. Korenowski*, 2017-Ohio-7050, ¶¶11–15 (Ohio App. 2017).

### H. Intentional Infliction of Emotional Distress

To prevail on a claim of intentional infliction of emotional distress (IIED), the plaintiff must establish that: 1) the defendant intended to cause emotional distress or knew or should have known that his actions would result in such distress; 2) the defendant's conduct was so extreme and outrageous as to go beyond all possible bounds of decency; 3) the defendant proximately caused plaintiff's psychic injury; and 4) the plaintiff's mental anguish is serious and of such a

degree that no reasonable person could be expected to endure it. *Retuerto v. Berea Moving Storage & Logistics*, 2015-Ohio-2404, ¶64 (Ohio App. 2015).

Holland bases his IIED claim on "the discrimination and retaliation [that he] sustained." (Doc. 21 at 33). He also relies on having to "watch the repeated deaths and carnage" of patients at the Mercy hospitals, which he attributes to Hashmi's inadequacies as a surgeon and Andrabi and Mercy's cover-up efforts. (*Id.*).

Defendants argue that this conduct is not sufficiently outrageous to support an IIED claim.

Regarding the alleged workplace discrimination and retaliation, defendants argue that this behavior "is not even criminal, let alone worse than criminal" (Doc. 17 at 35), a standard the Ohio Supreme Court adopted in *Yeager v. Local Union 20*, 6 Ohio St. 3d 369, 374–75 (1983).

As for Holland having to witness and cope with patient deaths, defendants argue that such conduct cannot form the basis of an IIED claim. Relying on *Arnold v. Wilder*, 657 F.3d 353 (6th Cir. 2011), defendants maintain that intentional conducted directed at a third party – here, the patients whose deaths flowed from Hashmi's malpractice and Andrabi's cover-up efforts – cannot support an IIED claim. Rather, the claim must rest on intentional conduct directed at the plaintiff.

I agree with the defendants on both fronts.

First, if Holland were correct that workplace discrimination and retaliation could also support an IIED claim, every Title VII case would also be a state-law tort case. That is not correct, however, given that IIED claims must involve conduct that is worse than criminal.

Second, I agree that the allegations regarding patient deaths at the Mercy hospitals do not support the IIED claim. Ohio has not adopted § 46(2) of the Restatement (Second) of the Law of

Torts, which creates, in limited circumstances that would not apply to Holland in any event, a cause of action where the plaintiff witnesses extreme conduct "directed at a third person." Because the complaint does not allege that the defendants caused or allowed the patient deaths for the purpose of inflicting injuries on Holland, his claim is implausible.

Defendants are therefore entitled to judgment as a matter of law on the IIED claim in Count VIII.

## I. Leave to Amend

Holland's opposition brief requests leave to amend his complaint to cure any "technical deficiency" I might find in the complaint. (Doc. 21 at 35).

"A party seeking leave to amend must file a motion stating its grounds for amending the complaint with particularity. A bare request for leave in an opposition to a motion to dismiss – without any indication of the particular grounds on which amendment is sought – does not constitute such a motion." *Brown*, *supra*, 996 F. Supp. 2d at 647–48.

As in *Brown*, *supra*, here I also "decline to predetermine, in the absence of a proper motion and proposed complaint, whether leave to amend should be given. That decision must await the filing, if any, of an appropriate motion and proposed amended complaint." *Id.* at 648.

## Conclusion

It is, therefore

ORDERED THAT:

1. Defendants' motion for judgment on the pleadings (Doc. 17) be, and the same hereby is, granted: (A) with prejudice as to the Title VII claims and Ohio whistleblower claims against defendants Hashmi and Andrabi in their individual

capacities; and (B) as to all other claims, without prejudice to plaintiff's filing of a motion for leave to amend and a proposed amended complaint.

2.      Motion for leave to amend and proposed amended complaint, if any, due December 11, 2018; opposition due January 8, 2019; and reply brief due January 18, 2019. The parties' principal briefs may not exceed twenty pages, and plaintiff's reply may not exceed ten pages.

3.      Leave granted to plaintiff to file motion for leave to amend and proposed amended complaint under seal.

4.      If no motion for leave to amend and proposed amended complaint are filed, this order will be converted to a grant of the defendants' motion with prejudice as to all claims against all defendants discussed herein.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge
