# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

Fred W. Holland, M.D.,                              Case No. 3:18-cv-490-JGC

        Plaintiff

      v.                                        **ORDER**

Mercy Health, et al.,

        Defendants

Fred W. Holland, M.D., a cardiothoracic surgeon, asserts claims under Title VII, 42 U.S.C. § 2000(e) et seq., and 42 U.S.C. § 1981, as well as additional, pendant state-law discrimination claims and claims for tortious interference with contract and with prospective business opportunity against one of his two former joint employers, Mercy Health—St. Vincent's Medical Center ("St. Vincent"). He asserts that St. Vincent's then Senior Vice President and Chief Physician Executive Officer, Imran Andrabi, and its then Medical Director of its Cardiothoracic Surgery Practice, Dr. Fayyaz Hashmi, who are both of Pakistani origin, discriminated against him because he is an American-born Caucasian.

Pending is St. Vincent's Motion for Summary Judgment. (Doc. 117). For the reasons discussed below, I grant St. Vincent's motion.

## Background

### 1. Dr. Holland's Employment with St. Vincent and the Toledo Clinic

As discussed in a prior order, *Holland v. Mercy Health*, 495 F. Supp.3d 582 (N.D. Ohio 2020) (Doc. 102), the Toledo Clinic ("TC") and defendant St. Vincent jointly employed Dr. Holland to serve as a cardiothoracic surgeon operating from St. Vincent's facilities.

TC had cardiologists on staff but had no cardiothoracic surgeons. (Doc. 73, pgID 4255); (Doc. 89, pgID 4779). It also lacked the equipment and staff necessary to operate a cardiothoracic surgery practice. (Doc. 68, pgID 3178-79). TC believed that having its own cardiothoracic surgeon to whom its cardiologists could refer patients would advance its business prospects. (Doc. 63, pgID 1111-12). St. Vincent had an opening for a third surgeon in its cardiothoracic surgery department. (Doc. 90-74, pgID 5405-06).

The parties created an employment structure for a new surgeon to serve their mutual interests. On December 12, 2012, St. Vincent and Toledo Clinic signed a Services Agreement under which Toledo Clinic would hire a cardiothoracic surgeon and assign him to perform his work at St. Vincent (the "Services Agreement"). (Doc. 129-51, pgID 12996-13007). St. Vincent agreed to provide the facilities, equipment, and personnel necessary for the surgeon to perform his work. (*Id.,* pgID 4558).

Toledo Clinic based the surgeon's projected salary on data regarding the compensation of other cardiothoracic surgeons in the market and in an amount that St. Vincent approved. (Doc. 71, pgID 3942-43); (Doc. 68, pgID 3193-92). The parties agreed that St. Vincent would pay Toledo Clinic at a set yearly rate for five years to compensate for the surgeon's salary, benefits, and related administrative expenses. (Doc. 129-51, pgId 12998, 13007). The total St. Vincent payments started at $712,304.70 for year one and rose to $729,757.16 in year five. (*Id.*, pgID 13007).

Toledo Clinic and St. Vincent worked together to find a surgeon to implement their agreement. (Doc. 71, pgID 3806-07, 3814-15). St. Vincent took the lead because it had a medical staff recruiter, Thomas Leeds, and a recruitment budget while Toledo Clinic lacked either. (*Id.*). The parties identified Dr. Holland as a candidate.

As part of the hiring process, Dr. Holland interviewed with representatives of both St. Vincent and Toledo Clinic. (Doc. 90-21, pgID 5056-57). Those interviews included an interview with St. Vincent's Dr. Andrabi, and a dinner with St. Vincent cardiothoracic surgeon Dr. Hashmi. (*Id.*). Both doctors approved hiring Dr. Holland. (Doc. 69, pgID 3544).

### 2. Dr. Holland's Complaints Regarding Patient Referrals

While practicing at St. Vincent, Dr. Holland, like St. Vincent's other cardiothoracic surgeons, could receive referrals that cardiologists directed to him. In addition, some cardiologists referred patients to St. Vincent without specifying which surgeon they intended to treat the patient.

St. Vincent had a system for distributing non-surgeon-specific referrals, set out in an email by another cardiothoracic surgeon, Dr. Jim Burdine, in 2013. (Doc. 129-17, pgID 12876). That email stated that the surgeon present or on call at the time the referral came in would determine which surgeon would treat the patient. Nevertheless, it also stated that St. Vincent would honor any referring physician's request that a referred patient see a particular surgeon. (*Id.*).

Dr. Holland contests whether St. Vincent's cardiothoracic surgery department actually followed those procedures. He alleges that Dr. Hashmi "controlled" non-physician-specific referrals as Medical Director of the department through his control of the department's Practice Manager, Elizabeth Sheroian. He asserts that Ms. Sheroian intentionally diverted non-physician-specific referrals to Dr. Hashmi. (Doc. 131, pgID 13684-85).

Notably, Dr. Hashmi stepped down as Medical Director in or before August 2015. (Doc. 75, pgID 4108). Dr. Christopher Phillips, a Caucasian American, assumed the position. (Doc.

129-81, pgID 13340). Dr. Holland has submitted no evidence that his referral volumes changed significantly after that time. Instead, his claims rest, in part, on the fact that they did not.

During his time at St. Vincent, Dr. Holland complained frequently to a variety of St. Vincent officials and others regarding how many more referrals Dr. Hashmi received than he did and how poor a surgeon he believed Dr. Hashmi to be. *See, e.g.*, (Doc. 131, pgID 13685-88, 13963-94); (Doc. 129-47, pgID 12954, 12955-57, 12962-63, 12965-67, 12965-67, 12969). Dr. Holland apparently believes that he was entitled to receive more referrals because he considered himself to be a superior surgeon. He based that contention on patient outcome data and his allegations regarding what he considered to be Dr. Hashmi's repeated medical malpractice. *See, e.g.*, (Doc. 131, pgID 13687, 13704-05, 13727-28); (Doc. 129-47, pgID 12954, 12955-57, 12962-63, 12965-67, 12965-67, 12969).

In October 2014, Dr. Holland began to focus his activities on developing a cardiothoracic surgery practice at another local Mercy hospital, Mercy Health - St. Anne ("St. Anne"). (Doc. 66, pgID 2495). He also continued to perform some surgeries at St. Vincent. (*Id.*, pgId 2498).

### 3. St. Vincent's Termination of the Services Agreement

Dr. Holland's employment agreement with TC did not have any specific ending date. Instead, it stated that his employment "shall continue until terminated" by either party, subject to ninety days' notice. (Doc. 129-75, pgID 13271).

St. Vincent's Services Agreement with TC to obtain Dr. Holland's services had a five-year term "unless terminated sooner." (Doc. 129-51, pgID 13000). The Services Agreement further provided that either party could terminate it at any time after one year without cause by giving the other party ninety days prior written notice. (*Id.*). The agreement specified that it

"[wa]s not intended to and d[id] not confer any legal rights or benefits upon any person or entity other than the parties to this Agreement." (*Id.*, pgID 13003).

By letter of November 28, 2016, St. Vincent's then interim President, Thomas J. Arquilla, gave TC written notice that it would terminate its agreement regarding Dr. Holland's position effective February 28, 2017. (Doc. 117-37, pgID 10211).

Arquilla testified that in 2016, he and his executive group discussed Dr. Holland's future with St. Vincent in their weekly meetings because the Services Agreement was due for possible renewal in December 2016. (Doc. 64, pgID 1581). The group included Dr. Andrabi, who had been promoted to CEO of Mercy Health's Toledo region, Brad Bertke, St. Anne's President, and General Counsel, Katrina English. (*Id.*).

Arquilla testified that they decided not to renew the Services Agreement for Dr. Holland because "it was five years and Dr. Holland had not been able to get enough support to eventually, in my opinion, be successful and that the volume needed to grow at St. Anne's was not happening fast enough." (*Id.*). Arquilla "believed that the agreement no longer benefited the business purposes of Mercy." (*Id.*).

Arquilla testified that the idea behind the Services Agreement had been that Dr. Holland would build his practice from referrals from TC cardiologists. (*Id.*, pgID 1586-87). Arquilla stated that a significant part of the problem with Dr. Holland's volume of work was that the cardiologists at TC, his colleagues, did not refer enough cases to him but instead, continued referring "a lot" of their patients to Toledo Hospital. (*Id.*).

Arquilla explained that the business assumptions underlying the Services Agreement included that St. Vincent "would grow [it's] cardiovascular service line" by having TC's

cardiologists refer patients to Dr. Holland at St. Vincent. However, he concluded after five years that "the Agreement didn't work." (*Id.*, pgID 1642).

He also pointed to Dr. Holland's constant conflicts with Dr. Hashmi as a reason for the decision, stating "we no longer could be a party to an agreement with the Toledo Clinic when the guy that they had chosen couldn't get along with the other guys, particularly Hashmi." (*Id.*, pgID 1644).

### 4. Dr. Holland's Retaliation Allegations

Dr. Holland filed a discrimination claim with the Equal Employment Opportunity Commission ("EEOC") on February 24, 2017. (Doc. 129-57, pgID 13086-91). Arquilla testified that he became aware of Dr. Holland's EEOC claim in March or April 2017. He attended a meeting in which St. Vincent's General Counsel, informed the executives present of Dr. Holland's claim and instructed them not to retaliate against Dr. Holland. (*Id.*, pgID 1608-09).

For some months before the February 28, 2017 end of the Services Agreement, Bertke attempted to arrange a Call Agreement for Dr. Holland so that he could continue to perform surgeries at St. Anne and St. Vincent (the "Call Agreement"). (Doc. 129-47, pgID 12955). On February 23, 3017, a St. Vincent paralegal forwarded to Bertke a final version of the proposed Call Agreement. (Doc. 129-45).

Bertke and Dr. Holland signed the Call Agreement, and Bertke forwarded it to Arquilla for signature on St. Vincent's behalf. (Doc. 129-47, pgID 12952, 12955). Arquilla, however, did not promptly sign the agreement. Arquilla testified that he did not execute the Call Agreement because it was no longer within his authority to do so. (Doc. 64, pgID 1600-02).

Arquilla's primary responsibilities at St. Vincent had been as Vice President of Business Development and later as Chief Strategy Officer. (*Id.*, pgID 1601-02). He became St. Vincent's

Interim President after St. Vincent terminated its prior President, while it was transitioning to a new President. The new President was Jeff Dempsey, who previously was President of Mercy Health - St. Charles Medical Center. (*Id.*, pgID 1599). Dempsey began making the transition in early April 2017. (*Id.*, pgID 1602-03).

Arquilla testified that at the time he received the partially signed Call Agreement, which called for his signature as Interim President, he no longer held that position. (*Id.* pgID 129-30). He had returned to his position as Chief Strategy Officer. (*Id.*, pgID 1544-45). He stated that, in that role, he lacked the authority to execute the Call Agreement. (*Id.*). Arquilla also noted that he left St. Vincent shortly after he declined to execute the Call Agreement. (*Id.*, pgID 1545). He gave St. Vincent notice of his resignation "in May or prior to that" and officially resigned "somewhere around June 6, 12th." (*Id.* pgID 1533).

In about the same time-period, Dr. Andrabi was beginning his own transition away from his position with Mercy. In an April 19, 2017 memo, the CEO of St. Vincent's parent advised the other leaders of Mercy Health's facilities in Toledo that Dr. Andrabi would be leaving Mercy for a position at another hospital effective May 26, 2017. (Doc. 63, PgID 1254-55). Andrabi testified that he began his interview process for that position "probably in the March time frame," after a recruiter solicited him for the position. (*Id.*).

On May 4, 2017, Gregory Hood, St. Vincent's Director of its Cardiology Service Line, (Doc. 67, pgID 2816), informed Dr. Holland that he would be "included in the new contract" and that St. Vincent was waiting for TC to approve it. (Doc. 129-39, pgID 12935). Hood explained the two-month delay as the result of the fact that, at Mercy, "it takes about three months to four months to get an agreement signed." (Doc. 67, pgID 3061). He stated that the delay was because agreements first required amendment for the correct effective date and signatures of the correct

St. Vincent personnel. (*Id.*, pgID 3062). They then required approval by Mercy's Physician

Strategy Council, which only met once per month. (*Id.*).

### Retaliation

Dr. Holland, filed a second EEOC complaint on March 28, 2017, alleging, *inter alia*, that

St. Vincent delayed signing his Call Agreement in retribution for his EEOC filing. (Doc. 126-36,

pgID 12579-81). Dr. Holland argues that a surreptitious, undated recording he made of a meeting

between himself and Bertke, establishes that St. Vincent delayed executing his Call Agreement

in retaliation for his EEOC complaint. (Doc. 131, pgID 13731-32). What Dr. Holland calls

admissions by Bertke are opinion and speculation.

During the meeting, Bertke recounted that in his discussions with St. Vincent regarding

the Call Agreement, he had learned that Dr. Holland had filed "some type of complaint" against

Drs. Andrabi and Hashmi. (Doc. 129-47, pgID 12952). He then opined that the complaint was

"kind of putting a cloud over" the Call Agreement. (*Id.*).

Although Dr. Holland did not mention it in his brief, there was another unidentified

speaker in the meeting. That speaker stated that he had worked to "try to make this as soft a

landing [for Dr. Holland] as we can, but [the EEOC claim] "is going to put some cloud over that.

I don't know what exactly." (*Id.*, pgID 12955). That same speaker also mused: "I'm not sure how

[the Call Agreement is] going to hold up under what's going on. So I just wanted to let you

know." (*Id.*, pgID 12958).

Dr. Holland then asked whether "[b]ut for certain, th[e call] agreement is off?" (*Id.*). The

unidentified speaker responded: "[t]hat's not what I said. . ." (*Id.*). The speaker continued to

explain that: "I didn't really say that. I'm just kind of alerting you to some things I wasn't aware

of and then saying, well, what's the implication of this." (*Id.*, pgID 12959). Dr. Holland

speculated in response; "[b]ut you never know. They might—they might reflect upon the situation and come up with some kind of an offer of a solution." (*Id.*, pgID 12960).

Dr. Holland also provides no evidence that Bertke would be privy to St. Vincent's reasons for not promptly signing the agreement, especially if the true reason was intentional retaliation.

Dempsey executed Dr. Holland's Call Agreement between May 9 and 11, 2017. (Doc. 129-94, pgID 13510). During the period between the end date of the Services Agreement on February 28, 2017 and Dempsey's signing of the Call Agreement, the evidence reflects that Dr. Holland continued to take his usual on-call assignments and to perform surgeries. *See* (Doc. 66, pgID 2588-89); (Doc. 90-39, pgID 5106, 5108, 5120, 5124-25).

At his deposition, Dr. Holland responded to the question: "[b]etween March 1 of 2017 and May 10 of 2017, did you work and get paid for call?" (Doc 66, pgID 2588). His response was: "I assume I did but I don't know the specifics." (*Id.*).

Dr. Holland also could not remember whether he received payments by check or through a credit to his account. (*Id.*) He also could not say how much he earned on average per call once the Call Agreement went into effect. (*Id.*). Nothing in Dr. Holland's opposition brief presents any explanation or evidence to raise a genuine issue of material fact regarding what, if any, harm he may have suffered as the result of the agreement's delay.

### Summary Judgment Standard

Summary judgment is appropriate under Fed. R. Civ. P. 56 where the opposing party fails to show the existence of an essential element for which that party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant must initially show the absence of a genuine issue of material fact. *Id.* at 323. Once the movant carries its burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and submit admissible evidence supporting its position. *Celotex*, *supra*, 477 U.S. at 324.

Summary judgment is proper where "in light of the evidence viewed in the light most favorable to the [nonmovant], no reasonable juror could fail to return a verdict for the [movant]." *Benison v. Ross*, 765 F.3d 649, 658 (6th Cir. 2014).

To be considered as support for a summary judgment motion, evidence must be admissible and must create a genuine factual issue. *Celotex, supra*, 477 U.S. at 324. "Speculation does not create a genuine issue of fact." *Cobb v. Keystone Memphis, LLC*, 526 F. App'x 623, 630 (6th Cir. 2013) (quoting *Hedberg v. Ind. Bell Tel. Co., Inc.*, 47 F.3d 928, 932 (7th Cir. 1995)).

With only limited exceptions, personal opinion cannot establish a genuine factual issue to defeat summary judgment. *See United States v. Lanci*, 669 F.2d 391, 394-95 (6th Cir. 1982); Fed. R. Evid. 602. A plaintiff's subjective belief that he or she was discriminated against does not constitute probative evidence of such discrimination unless the party can present objective evidence to establish that the opinion is accurate. *See Murray v. Sears, Roebuck & Co.*, 722 F. Supp. 1500, 1505 (N.D. Ohio 1989) (Aldrich, J.). Inadmissible hearsay also cannot raise a genuine factual issue to defeat summary judgment. *Quintanilla v. AK Tube LLC*, 477 F. Supp. 2d 828, 836 (N.D. Ohio 2007) (Katz, J.) (citing *Jacklyn v. Schering–Plough Healthcare Prods. Sales Corp.,* 176 F.3d 921, 927 (6th Cir. 1999)).

## Discussion

### 1.  Dr. Holland's Brief Relies Heavily on Some Common Erroneous Premises

10

Rather than providing admissible, probative evidence to oppose summary judgment, Dr.
Holland's opposition brief presents page after page of inadmissible hearsay – often multiple
levels – speculation, opinion, and distortion of the record evidence.

Moreover, the opposition also rests on several basic legal fallacies that permeate its
arguments. Rather than address those fallacies repetitively, I will discuss them once at the outset.

### A.  St. Vincent Cannot Be Liable for Referring Physicians' Referral Choices

One legal fallacy that underlies Dr. Holland's arguments is his extraordinary theory that
St. Vincent can be liable because independent cardiologists chose to refer their patients to Dr.
Hashmi rather than to him. Dr. Holland states in his opposition that "the crux" of his
discrimination claim" is that "despite TCC [Toledo Cardiology Consultants] having knowledge
about the data and surgical outcomes of himself, Dr. Hashmi and Dr. Phillip's, the referrals went
to Dr. Hashmi alone." (Doc. 131, pgID 13729).

Dr. Holland's decision to make that issue the crux of his claims simply is
incomprehensible. He has not cited to any authority whatsoever for his novel theory that St.
Vincent somehow can be liable for employment discrimination based on voluntary patient
referral decisions made by independent physicians. Nor has he explained how St. Vincent could
have prevented referring physicians from choosing to send their patients to Dr. Hashmi. Even if
he could prove that discrimination played a part in those referring physician's decisions, his
argument against St. Vincent would remain utterly devoid of merit.

### B.  Dr. Holland's Reliance on Patient Outcome Data Is Meritless

A pervasive theme throughout Dr. Holland's opposition is that somehow he was entitled
to have other doctors make referrals to him rather than to Dr. Hashmi because he asserts based
on outcome statistics that he is a superior surgeon. His argument fails.

11

This is not an American Medical Association licensing or accreditation proceeding or an ethics complaint. Dr. Holland only can recover by establishing that *St. Vincent* discriminated against him. Dr. Holland has presented no authority whatsoever for the proposition that referring physicians are required legally to base their referral decisions on outcome statistics.

Referral decisions based on professional and/or personal differences are insufficient to show discrimination, even on the part of the referring physician. *Gomez v. Allegheny Health Servs., Inc.*, 71 F.3d 1079, 1086 (3d Cir. 1995) (citing *Bellissimo v. Westinghouse Elec. Corp.,* 764 F.2d 175, 182 (3d Cir. 1985)); *see Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1094 (6th Cir. 1996) (referring doctors' statements that another doctor had "greater compatibility with their individual philosophies of care" and had "more skillful interactions with both themselves and their patients" presented legitimate, nondiscriminatory reason for referrals").

Dr. Holland devotes a considerable portion of his seventy-page brief to allegations that he was a superior surgeon, while Dr. Hashmi was an incompetent one. *See* (Doc. 131, pgID 13685-87, 13689-90, 13693-94, 13704, 13728-29). Indeed, Dr. Holland's brief amply reflects that he complained about Dr. Hashmi's alleged incompetence to everyone at St. Vincent or St. Anne who would listen.

If Dr. Hashmi actually failed to treat a patient competently, then that is an issue between the patient, him, St. Vincent, any accrediting agency, and his and St. Vincent's malpractice insurer. It would not give rise to any claim by Dr. Holland, let alone one for employment discrimination. Even if taken as true, Dr. Holland's allegations against Dr. Hashmi are all but irrelevant to his claims.

12

### C.  St. Vincent Had No Obligation to "Continue to Subsidize Dr. Holland's Income"[1]

Dr. Holland is under the extraordinary impression that St. Vincent had an obligation to continue paying Toledo Clinic for his services or otherwise ensure his continuing income, apparently indefinitely, even after it terminated its service agreement with TC. Not surprisingly, he offers no authority, and not even any explanation, for that frivolous proposition.

As Dr. Holland's joint employer for employment discrimination purposes, St. Vincent had the obligation not to discriminate impermissibly against him. But that does not mean that St. Vincent had any obligation to continue its agreement with TC if it believed doing so was not in its best interests. "Title VII eliminates certain bases for distinguishing among employees while otherwise preserving employers' freedom of choice." *Price Waterhouse v. Hopkins,* 490 U.S. 228, 239 (1989).

St. Vincent contracted with TC for a surgeon's services because it wanted to grow its cardiothoracic surgery practice. The Services Agreement provided for a five-year term and specified that either party could terminate the arrangement upon ninety-days' notice without cause. (Doc. 129, pgID 13271). If St. Vincent decided the arrangement would not achieve its business goal, it was free not to renew it. Once St. Vincent did so, it had no further obligation to Dr. Holland.

Dr. Holland only has a claim if he can show that reverse discrimination was the reason St. Vincent decided to end its contract with TC. As discussed below, he simply has not done so.

---

[1] (Doc. 131, pgID 13740). The above quotation appears in the section of Dr. Holland's opposition relating to his tortious interference claim. Nevertheless, it is one of the premises on which he bases his arguments throughout his brief.

13

### 2.  Dr. Holland's Employment Discrimination Claim
### Employment Discrimination Legal Standard

To analyze an employment discrimination claim in a case lacking direct evidence of

discrimination,[2] I apply the burden-shifting framework established in *McDonnell Douglas Corp.*

*v. Green,* 411 U.S. 792 (1973). *See Donald v. Sybra, Inc.,* 667 F.3d 757, 762 (6th Cir. 2012).

Under that framework,

> First, [Dr. Holland] must make his prima facie case. *See Seeger v.*
> *Cincinnati Bell Tel. Co., LLC,* 681 F.3d 274, 283-85 (6th Cir.2012).
> The burden then shifts to [St. Vincent] to present legitimate,
> nondiscriminatory reasons for . . . terminating [his employment].
> *See id.* If [St. Vincent] carries that burden, [Dr. Holland] must show
> [St. Vincent's] reasons are pretext for unlawful discrimination. *See*
> *id.*

*Amstutz v. Liberty Ctr. Bd. Of Educ.*, 127 F. Supp. 3d 846, 852 (N.D. Ohio 2015) (Carr, J.).

### (i)  Prima Facie Case

The Sixth Circuit has defined the standard for proving a prima facie case of reverse

employment discrimination.

> "Reverse discrimination" claims require application of a *McDonnell*
> *Douglas* standard modified to reflect this context as well as the
> factual situation of the claim.
>
> In our view, the "reverse discrimination" complainant bears the
> burden of demonstrating that he was intentionally discriminated
> against "despite his majority status." We agree with the district court

---

[2] Dr. Holland devotes eight pages of his opposition to his argument that he may escape the
McDonnell Douglas burden-shifting analysis because he can present direct evidence of
discrimination. (Doc. 131, pgID 13708-16). The argument contradicts basic employment
discrimination principles.

As the Sixth Circuit has explained "many times, '[d]irect evidence is that evidence which, if
believed, requires the conclusion that unlawful discrimination was at least a motivating factor in
the employer's actions.'" *Amini v. Oberlin Coll.*, 440 F.3d 350, 359 (6th Cir. 2006) (alteration in
original) (quoting *Kocak v. Cmty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 470 (6th Cir.
2005)). "Evidence of discrimination is not considered direct evidence unless a racial motivation
is explicitly expressed." *Id.* None of Dr. Holland's so-called direct evidence shows that St.
Vincent's officers expressed racial animus. His attempt to portray his arguments as based on
direct evidence is disingenuous at best.

that a prima facie case of "reverse discrimination" is established upon a showing that "background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority," and upon a showing that the employer treated differently employees who were similarly situated but not members of the protected group.

*Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63, 67 (6th Cir. 1985).

Because the outcome of this case turns on Dr. Holland's inability to show that St. Vincent's stated reasons for terminating the Services Agreement were pretextual, I will assume, *arguendo*, that Dr. Holland has stated a prima facie case.

### ii. Legitimate, Nondiscriminatory Reasons

As discussed above, St. Vincent's stated reasons for not renewing the Services Agreement were that: 1) he had failed, over five years' time, to generate sufficient referrals to build a sustainable practice, let alone to grow St. Vincent's cardiothoracic surgery practice; and 2) he could not get along with other doctors, most especially Dr. Hashmi. (Doc. 64, pgID 1640-44).

Dr. Holland contends that St. Vincent's stated reasons for not renewing the Services Agreement were pretextual. His arguments to support that contention are meritless.

Dr. Holland does not contest that he was unsuccessful in generating a sufficient number of referrals to support a viable practice. In 2015, for example, Dr. Hashmi performed two hundred and ten surgeries, while Dr. Holland only performed thirty-two. (Doc. 129-24, pgID 12887).

Dr. Holland asserts St. Vincent's argument that his failure to perform sufficient surgeries to justify his retention is pretextual because he "did not have in his contract any volume quota he was required to meet." (Doc. 131, pgID 13694). His argument apparently rests on his completely unsupported theory that St. Vincent somehow was required to continue to "subsidize" his

15

income, apparently indefinitely, regardless of his ability to generate work for himself. (*Id.*, pgID 13740). As discussed above, his theory is meritless.

Moreover, although, for employment discrimination purposes, St. Vincent and TC were Dr. Holland's joint employers, his contract was with TC. TC's other physicians did not have volume requirements because, unlike him, TC compensated them on a "revenue-minus-expenses model." Thus, their pay rate directly related to their ability to generate their own patients.

Dr. Holland's compensation was guaranteed at a set level under the Services Agreement. Thus, so long as Dr. Holland worked under the Services Agreement, St. Vincent was obligated to compensate TC for his salary, benefits, and TC's administrative costs in employing him regardless whether he generated any business for St. Vincent.

After five years, St. Vincent determined that the agreement "wasn't working." (Doc. 64, pgID 1642). It certainly was within its rights not to renew the agreement. The only basis on which Dr. Holland could have a claim against St. Vincent for that decision is if he could show it was the product of discrimination. As discussed below, he has failed to raise a genuine factual issue that St. Vincent terminated the Services Agreement for discriminatory reasons.

Notably, St. Vincent did not revoke Dr. Holland's privileges when it ended the Services Agreement. (Doc. 129-10, pgID 12857). He continued to perform call services there. He also remained the Medical Director of Cardiothoracic Surgery at St. Anne until he resigned voluntarily about one-year later. (Doc. 63, pgID 2022-24); (Doc. 126-38, pgID 12585).

That Dr. Holland was unable to find enough patients to produce a satisfactory income under TC's revenue-minus-expenses compensation system is not a basis to impose liability on St.

16

Vincent. Instead, it supports St. Vincent's determination that, after five years, Dr. Holland had demonstrated that he was unlikely to develop a viable practice of his own.[3]

Dr. Holland also argues that Arquilla's second stated reason for not renewing the Services Agreement – that he could not get along with the other doctors, particularly Dr. Hashmi – is pretextual because he got along well with Dr. Phillips. The fact Dr. Holland may have gotten along well with Dr. Phillips does not show that Arquilla's explanation was pretextual.

The evidence reflects that Dr. Hashmi obtained by far the bulk of the referrals and performed by far the bulk of surgeries for St. Vincent's cardiothoracic surgery practice. Dr. Hashmi was the backbone of the practice.

In contrast, Dr. Holland was a TC employee, who worked at St. Vincent and St. Anne on a contract basis and had failed to grow the practice significantly over the five years he worked there. Thus, Dr. Holland's inability to get along with Dr. Hashmi and his constant statements that Dr. Hashmi was incompetent were legitimate business considerations for St. Vincent.

The evidence also amply supports St. Vincent's second reason for not renewing the Services Agreement – that Dr. Holland was unable to get along with Dr. Hashmi and other

---

[3] Dr. Holland argues that St. Vincent's reliance on his failure to develop a practice was a pretextual reason for not renewing the Services Agreement. He asserts that it is factually incorrect because it "was contradicted by Dr. Phillips, who testified that St. Anne's volume increased." (Doc. 131, pgID 13726). In fact, however, what Dr. Phillips actually testified was that that St. Anne "was a low volume program from the beginning. . . . And if anything, the volume actually increased. *Not by a lot*, but it did go up." (Doc. 115, pgID 9397) (emphasis added). Pointing to a portion of Dr. Phillips' statement about St. Anne while leaving out the most germane part is not a convincing form of legal argument.

Arquilla agreed with Dr. Phillips that Dr. Holland was growing the cardiothoracic surgery practice at St. Anne, but also stated that "it wasn't growing a lot." (Doc. 129-47). He testified that that St. Anne's program's growth "was not happening fast enough." (Doc. 64, pgID 1581).

Dr. Holland has presented no statistical or financial information to support his challenge to Mercy's explanation that it did not renew the Services Agreement because he had not adequately built a practice for it to make business sense for St. Vincent to continue the arrangement.

17

doctors. The evidence shows that Dr. Holland considered Dr. Hashmi to be incompetent and expressed that opinion to virtually anyone who would listen to him. He also accused Dr. Hashmi of controlling and monopolizing non-surgeon-specific referrals without competent evidence to back up the allegation. *See* (Doc. 131, pgID 13683-84).

As the unidentified speaker told Dr. Holland during his surreptitiously recorded conversation of his Bertke meeting, Dr. Holland's problems largely resulted from the frequency with which he criticized Dr. Hashmi's competence in discussions with other Mercy personnel. (Doc. 129-47, pgID 12964-65). Nevertheless, Dr. Holland continued to criticize Dr. Hashmi's competence extensively throughout that very conversation. (*Id.*, pgID 12953, 12954, 12955-57, 12962-63, 12965-67, 12969).

The unidentified speaker in that conversation explained the problem this created by saying: "I can't have somebody cover me or I'm not going to cover for somebody who's constantly pointing out my quality issues. And I'm not saying it's right or wrong; I'm just saying if I were him, I probably wouldn't want it either." (*Id.*, pgID 12964-65).

St. Vincent also has presented the affidavits of six cardiologists from Toledo Cardiology Consultants, explaining why they chose not to refer patients to Dr. Holland.[4]

Dr. Ameer Kabour was President and CEO of that practice group. (Doc. 129-30, pgID 12910). He estimated that Toledo Cardiology Consultants, which employed ten cardiologists, provided about 80% of St. Vincent's cardiovascular cases and consultations. (*Id.*). He explained that the main reasons that he did not refer patients to Dr. Holland were professional disagreements and Dr. Holland's "demeaning and unprofessional attitude" toward him. (*Id.*, pgID 12911).

---

[4] (Docs. 129-2, 129-3, 129-109, 129-26, 129-30, 129-31).

He stated that Dr. Holland was "defensive and dismissive" of referring cardiologists' questions regarding his plan of care and expected them "to accept his plan of care and outcome without question." (*Id.*). As an example, Dr. Kabour asserted that Dr. Holland had embarrassed him in front of patients and laboratory staff by questioning his treatment plan and criticizing him. (*Id.*, pgID 12912).

Each of the other doctor/affiants also described Dr. Holland as inflexible and unwilling to work cooperatively and described his behavior as dismissive and disrespectful. Dr. Fadhi Hussein stated that he avoided Dr. Holland because Dr. Holland was "extremely difficult to work with personally and professionally." (Doc. 129-2, pgID 12815). Dr. Hussein stated that "it was [Dr. Holland's] way or the highway when it came to patient care." (*Id.*). *See also* (Doc. 129-3, pgID 12818) (Dr. Mohammed Taleb, stating that Dr. Holland "is dismissive of other professionals' opinions"); (Doc. 129-26, pgID 12892) (Dr. Tarif Kanaan stating that Dr. Holland "was a very difficult personality. He is very aggressive. Loud. Disrespectful and critical of contrary opinions"); (Doc. 129-31, pgID 12915) (Dr. Syed Sohail Ali stating that Dr. Holland was "disrespectful and verbally abusive," and that Dr. Holland cancelled a pulmonologist consultation that Dr. Ali had ordered); (Doc. 129-109, pgID 13645) (Dr. Mohammed Alo stating that Dr. Holland was "abrasive and condescending in personal and professional interaction" and that he would change Dr. Alo's medication orders);

In addition, Dr. Steven Bruhl, who was a St. Vincent employee, stated in his affidavit that working with Dr. Holland presented "significant professional and personal conflict." (Doc. 107, pgID 7515). Dr. Bruhl stated that Dr. Holland was "difficult to deal with as a surgeon" because he had a "know it all attitude and d[id] not like to be questioned. (*Id.*, pgID 7517). He stated that he did not refer patients to Dr. Holland. (*Id.*, pgID 751).

Professional and personal differences are a recognized reason why a doctors chooses not to refer patients to another doctor. "[G]ood faith differences between plaintiff and other members of the staff over the proper treatment of patients at the hospital as well as personality conflicts" are legitimate, nondiscriminatory reasons for referral decisions. *Gomez, supra,* 71 F.3d at 1085–86; *see also Betkerur, supra,* 78 F.3d at 1094 (another doctor's "more skillful interactions with both themselves and their patients" was a legitimate, nondiscriminatory basis for referral decisions).

"An 'unfortunate and destructive conflict of personalities does not establish [race or national origin] discrimination.'" *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 544 (3d Cir. 1992) (quoting *Bellissimo v. Westinghouse Elec. Co.,* 764 F.2d 175, 182 (3d Cir. 1985)), *abrogated on other grounds Price Waterhouse, supra*, 490 U.S. at 238. "[Q]uality patient care demands that doctors possess at least a reasonable 'ability to work with others.'" *Meyers v. Logan Mem'l Hosp.*, 82 F. Supp. 2d 707, 714 (W.D. Ky. 2000) (quoting *Rooney v. Medical Ctr. Hosp.,* No. C2–91–1100, 1994 WL 854372, at *3 (S.D. Ohio )), *aff'd sub nom. Meyers v. Columbia/HCA Healthcare Corp.,* 341 F.3d 461 (6th Cir. 2003).

Moreover, Dr. Holland's own testimony supports the Toledo Cardiology Consultants' doctors' statements that he was rigid, disrespectful, and unwilling or unable to collaborate.

Dr. Holland disparaged physicians who train in "second or third world countries" as unfamiliar with American College of Cardiology guidelines. (Doc. 66, pgID 2236). He supported

20

that opinion by saying that "[m]any of these programs are not even accredited, for God's sake."[5] (*Id.*).

When questioned at deposition regarding the cardiologists' complaints, he responded by expressing derision for them professionally and personally.

Dr. Holland responded to Dr. Ali's affidavit by stating that "I think he probably needs to seek some health [sic] and Mercy needs to get him into a program quickly." (Doc. 66, pgID 2248). He accused Dr. Ali of being "delusional." (*Id.*, pgID 2249).

Dr. Holland responded to the other cardiologists' affidavits by accusing them of telling "fairytale[s], " (*id.*, pgID 2253), being "ignorant," (*id.* pgID 2259), and of taking a "misguided and usurped position" because "they think they are in control of the referrals," (*id.*, pgID 2310-11).

Dr. Holland also expressed his view of the superiority of American-trained doctors, couching his testimony with the phrase "what every physician should do, every American trained and certified" physicians would do. (*Id.*, pgID 2238); *see also* (Doc. 129-47, pgID 12966) (Dr. Holland stating "[t]here's not a cardiac surgeon in the United States who would . . . .). Moreover, he alleged in his amended complaint that "certain Pakistani's believe that . . . they are the superior race to all others.[6] (Doc. 39, pgID 466).

---

[5] While the record lacks evidence regarding the full training and experience of the referring doctors from Toledo Cardiology Consultants, it is telling that he addressed the same criticisms to Drs. Andrabi and Hashmi, stating derisively that they went to "the same . . . nonaccredited medical school in Pakistan." (Doc. 66, pgID 2427). That criticism ignores the facts that both those doctors were very senior, their medical school years were decades behind them, and both had significant training and experience in internships and post-doctoral education in America in addition to many years of practice in this country. *See* (Doc. 63, pgID 1071-72,1082-84 (Andrabi); (Doc. 110, pgID 8479-82) (Hashmi).

[6] Dr. Holland's constant disparagement and apparent contempt for the skills of foreign-trained doctors, particularly Pakistani doctors, raises the question whether his allegations of race and national origin discrimination are projections of his own biases.

Thus, Dr. Holland's argument that St. Vincent has failed to state a legitimate, nondiscriminatory reason for not renewing the Services Agreement is patently meritless. It has stated two of them.

### iii.  Pretext

Dr. Holland makes a number of arguments that St. Vincent's reasons for not renewing his contract were pretextual. I have addressed several of them already to some extent. None of them are meritorious.

### a.  No Volume Requirement in His Contract

Dr. Holland relies on his contention that St. Vincent's first stated reason for not renewing the Services Agreement – his failure to build his practice so that he did not perform sufficient surgeries – was pretextual. He argues that he had no volume requirement in his contract. For the reasons discussed above, that argument is meritless.

### b.  The Extent of Dr. Holland's Practice at St. Anne

Dr. Holland also argues that St. Vincent's explanation is pretextual because he built a practice at St. Anne. As discussed above, that argument, based on a distorted use of a partial quotation.

Dr. Holland argues that St. Vincent's reliance on his failure to develop a practice was a pretextual reason for not renewing the Services Agreement. He asserts that it is factually incorrect because it "was contradicted by Dr. Phillips, who testified that St. Anne's volume increased." (Doc. 131, pgID 13726).

In fact, however, what Dr. Phillips actually testified was that that St. Anne "was a low volume program from the beginning. . . . And if anything, the volume actually increased. *Not by a lot*, but it did go up." (Doc. 115, pgID 9397) (emphasis added). Pointing to a portion of Dr.

22

Phillips' statement about St. Anne while leaving out the most germane part is not a convincing form of legal argument.

Arquilla agreed with Dr. Phillips that Dr. Holland was growing the cardiothoracic surgery practice at St. Anne, but also stated that "it wasn't growing a lot." (Doc. 129-47). He testified that that St. Anne's program's growth "was not happening fast enough." (Doc. 64, pgID 1581).

Dr. Holland has presented no statistical or financial information to support his challenge to Mercy's explanation that it did not renew the Services Agreement because he had not adequately built a practice for it to make business sense for St. Vincent to continue the arrangement. More importantly, however, Dr. Holland has not argued that whatever surgeries he performed at St. Anne and at St. Vincent combined were sufficient to compensate St. Vincent for his salary.

### c. Dr. Holland's Inability to Get Along with Other Doctors

Dr. Holland responds to St. Vincent's contention that he was unable to get along with other doctors by asserting that he was able to get along well with Dr. Phillips. Dr. Phillips, like Dr. Holland, performed only a fraction of the surgeries that Dr. Hashmi did. (Doc. 129-24, pgID 12887). Thus, Dr. Holland's ability to get along with Dr. Phillips, from St. Vincent's perspective, paled in significance in comparison to his inability to get along with Dr. Hashmi. His constant criticisms of Dr. Hashmi's work as malpractice certainly did not further St. Vincent's efforts to grow its cardiothoracic surgery practice.

Dr. Holland misses the mark entirely when he responds to the affidavits of the Toledo Cardiology Consultants doctors by dismissing their affidavits as inaccurate and/or dishonest. *See* (Doc. 131, pgID 13700-04). Those attacks are entirely irrelevant.

"[A] party cannot demonstrate a genuine dispute merely by asserting that the witnesses are lying." *Rand v. CF Indus., Inc.*, 42 F.3d 1139, 1146-47 (7th Cir. 1994). Moreover, the issue here is not whether the affiant/doctors' criticisms were accurate or justified. What matters as to the pretext issue here is that the large group of cardiologists who provided a vast majority of St. Vincent's cardiothoracic surgery work chose not to refer work to Dr. Holland.

Their decision and Dr. Holland's inability to obtain enough other work rendered him unable to build a sustainable practice. As the Third Circuit has explained, the fact other doctors were unwilling to refer their patients to Dr. Holland is "sufficient to defeat the plaintiff's [discrimination claim] whether or not the cardiologists were objectively correct." *Gomez, supra*, 71 F.3d at 1085.

### d.  Dr. Holland's "Cat's Paw" Argument

Dr. Holland argues that he can establish discrimination through a so-called "cat's paw" analysis. (Doc. 131, pgID 13712-16). The argument is misplaced.

As the Sixth Circuit has explained, the "primary rationale" for the cat's paw doctrine:

> is that, because a company's organizational chart does not always accurately reflect its decisionmaking process, an employee of lower rank may have significant influence over the decisionmaker. The ultimate decisionmaker may be detached from day-to-day operations, and consequently apt to defer to the judgment of the [person] on the spot and at risk of being the conduit of [the lower-level decisionmaker's] prejudice. As a result, a biased low-level supervisor with no disciplinary authority might effectuate the termination of an employee from a protected class by recommending discharge or by selectively reporting or even fabricating information in communications with the formal decisionmaker.

*Marshall v. The Rawlings Co. LLC*, 854 F.3d 368, 378 (6th Cir. 2017) (alteration in original) (internal citations and quotation marks omitted).

Here, the St. Vincent and St. Anne executives made the decision not to renew the Services Agreement based on the recommendations of the leaders of two significant cardiology

practices who referred patients to St. Vincent and St. Anne. *See* (Doc. 129-9, pgID 12854); (Doc. 129-89, pgID 13348). Moreover, although Arquilla consulted Dr. Andrabi and others regarding his decision, Dr. Andrabi was not "an employee of lower rank," *Marshall, supra*, 854 F.3d at 378. There is no evidence that he "selectively report[ed] or even fabricat[ed] information," *id.*, regarding Dr. Holland's performance in order to induce Arquilla to terminate that employment.

Instead of the conspiracy between Drs. Andrabi and Hashmi that Dr. Holland alleges, the evidence reflects that Arquilla, whose job was to make decisions in the strategic interests of St. Vincent, made the decision not to renew. He did so after receiving recommendations from TC and of its largest referral source, Toledo Cariology Consultants. He implemented that decision after discussing it with other senior St. Vincent officials: Andrabi, then the president of Mercy's Toledo region, its General Counsel, and St. Anne's President, Bertke.

If Dr. Holland could establish a genuine factual issue regarding whether Dr. Andrabi actually directed Arquilla not to renew the Services Agreement and whether he did so for discriminatory reasons, then he could survive summary judgment. In that case, his cat's paw argument – in addition to being meritless - would be entirely unnecessary. The most he has been able to show, however, is that Arquilla consulted Dr. Andrabi, along with other St. Vincent and Mercy Health officials and counsel, before finalizing his decision. (Doc. 64, pgID 1581).

### e.  Dr. Holland's Attacks on Opposing Counsel Regarding the Affidavits

Dr. Holland's counsel is unable to contradict the basic fact that the Toledo Clinic Consultants' cardiologists declined to refer patients to Dr. Holland because they found him condescending, personally abusive, and simply not worth the trouble of working with. Instead, he turns to attacking St. Vincent's counsel. For the most part, his complaints are baseless, ad hominem attacks. *See* (Doc. 131, pgID 13699-701).

Dr. Holland feigns outrage over the fact that St. Vincent's counsel contacted the doctor/affiants, "and asked them to recount stories about their negative experiences working with Dr. Holland." (*Id.*, pgID 13700). He asserts that counsel then drafted affidavits for the doctors and "had TCC physicians sign" them. (*Id.*); *see also* (*id.* pgID 13701) ("[s]ince Mercy needed to perpetuate the lie that they had these physicians tell, either through testimony or through affidavits that Mercy's own counsel prepared . . . .").

Dr. Holland's attempt to paint St. Vincent's affidavit preparation procedure as improper is baseless. In my many years on the bench, I have seen few affidavits submitted by represented parties that were not prepared using just that methodology.

Dr. Holland's accusation that counsel had these physicians "lie" to support their accusations against him is beyond the pale.

First, as discussed above, whether the doctors' complaints were accurate is beside the point. Dr. Holland cannot dispute that those doctors chose not to refer their patients to him; indeed it is the very basis of his lawsuit.

Second, Dr. Holland accuses opposing counsel of lying to me through witness manipulation and of somehow "badgering" trained physicians into making false statements about their practices under oath. (*Id.*, pgID 12762-66). He bases those allegations solely on his argument that the physicians' statements are factually inaccurate and dishonest. His argument is unconvincing and unacceptable.

Dr. Holland's attempt to portray opposing counsel as "badgering the physicians" into submitting their affidavits," (*id.*), is disingenuous. Dr. Holland's counsel bases that allegation on the mere fact that St. Vincent's counsel sent two two-line emails to affiants. In those emails, St. Vincent's counsel stated that he was "just checking on [the doctor's] affidavit" and asked them

26

to submit the affidavits to him "this week." (Doc. 129-27, pgID 12894); (Doc. 129-28). Nothing about those emails constitutes "badgering" or is remotely inappropriate.

Dr. Holland also accuses St. Vincent's counsel of dishonesty based on a specific example of a patient that Dr. Taleb discussed in his affidavit. He asserts that St. Vincent's counsel attempted to mislead me regarding the date on which Dr. Holland treated that patient. (Doc. 131, pgID 13700).

The email exchange that he cites in support of his allegations is far less clear-cut than Dr. Holland's counsel portrays it to be.

When St. Vincent's counsel presented Dr. Taleb with his draft affidavit, he asked for clarification of the date when the incident involving the patient occurred. He wrote, "[y]ou were unsure about when the incident in paragraph 6(a) occurred. As a result, I did not put in a date. But I would like clarification if you can try to refresh your memory." (Doc. 129-5, pgID 12827). He then reminded Dr. Taleb that Dr. Holland began working at TC in 2013 and resigned in February 2018. He suggested that the incident would have occurred "within that timeframe." (*Id.*).

Dr. Taleb responded that he had inserted the date June 2017 in his affidavit for that incident. (*Id.*). St. Vincent's outside counsel's response was that St. Vincent's in-house counsel "suggested taking out the date because it may be grounds for a HIPAA violation. I thought putting a date in would add credibility but he said it could be enough identifying information together with the narrative to implicate a HIPPA violation. I agree." (*Id.*). He then asked Dr. Taleb to take the date out of the affidavit. (*Id.*).

Dr. Holland's counsel asserts that this exchange was an attempt by St. Vincent's counsel to mislead me into believing that the incident "occurred before Dr. Holland's Services Agreement was terminated." (Doc. 131, pgID 13700). His argument is meritless.

First, whether the specific incident Dr. Taleb recounted as an example of his experiences with Dr. Holland occurred before or after the Services Agreement ended is of little significance. Dr. Taleb stated generally that, in his experience and from information he learned from his colleagues, Dr. Holland was "rigid in his plan of care," "dismissive of other professionals' opinions," was "offended and defensive" when questioned, and did not show him "adequate respect as a professional." (Doc. 129-3, pgID 12818).

The fact that the specific incident Dr. Taleb used as an example did not occur while Dr. Holland was working under the Services Agreement but when he was working under the Call Agreement does not undermine Dr. Taleb's overall description of Dr. Holland. Indeed, Dr. Holland is asserting in this case that he was constructively discharged because he could not obtain sufficient referrals to earn an adequate income under the Call Agreement.[7] Dr. Taleb's example helps to explain why that was so.

It also supports and is supported by the other physician's affidavits, regardless of when the single incident it recounts as an example occurred. In light of the other six doctors' description of their experience with Dr. Holland, St. Vincent's counsel had little reason to misrepresent the date of the incident, and in fact, he did not do so.

---

[7] Dr. Holland's constructive discharge claim is irrelevant to the outcome of this case. When St. Vincent decided not to renew the Services Agreement, it terminated its status as his joint employer and effectively terminated his employment by it. If Dr. Holland could show that it did so for discriminatory reasons, then St. Vincent would be liable. Whether Dr. Holland subsequently remained unable to generate sufficient patient referrals to support his practice at TC has no bearing on the issue.

Second, cavalierly accusing opposing counsel of sanctionable ethical misconduct is
unacceptable conduct for a lawyer appearing before me. To cast such serious allegations as that
opposing counsel is intentionally making misrepresentations to a court can only be justified
when the violation is significant to the outcome of the case and supported by clear evidence. Dr.
Holland's counsel's accusations fail both of those criteria. This is not the first example in this
case of such conduct by Dr. Holland's counsel. *See, e.g.*, *Holland, supra*, 495 F. Supp. 3d at 591
n.7. Nor is it the first time I have cautioned him against such behavior. (*Id.*).

### f.  Whether Referring Doctors Were Able to
### Make Surgeon-Specific Referrals

Dr. Holland attempts to argue the novel proposition that referring doctors had no ability
to make referrals to a specific surgeon of their choice. The argument simply lacks any
evidentiary support.

First, Dr. Holland seeks to take advantage of the following statement in my prior opinion
on partial summary judgment that: "[w]hen St. Vincent's cardiologists needed a cardiothoracic
surgeon consultation, they did not refer the patient to a specific surgeon, but instead contacted
the cardiothoracic practice group. The practice group then assigned a surgeon to perform the
consultation and, if necessary, surgery." (Doc. 102, pgID 6284).

The prior partial summary judgment motion was limited to the issue whether St. Vincent
and its distant parent, Mercy Health, were Dr. Holland's joint employers with TC for
employment discrimination purposes. I made that statement in the opinion's background section
based on the materials submitted and the arguments raised in that motion. St. Vincent did not
address the issue at that time because it was not particularly relevant to the motion.

Now that the source of referrals is in dispute, and the parties have fully briefed it, I have
learned that approximately 80% of St. Vincent's cardiothoracic surgery patients came from

29

referrals by the Toledo Cardiac Consultants' doctors. Thus, the procedures for referrals by other St. Vincent doctors is largely irrelevant, and the parties have not even chosen to address it in their present briefing. I certainly do not feel bound by a statement I made in a background discussion of a then non-disputed issue.

Dr. Holland next attempts to support his allegation that non-St. Vincent referring doctors had no choice as to whom they referred their patients by asserting that Dr. Kabour stated in his deposition that "[u]sually we call the [St. Vincent cardiothoracic practice's] office and the office is the one who determined really where the patient [was] going. We did not have any control over that." (Doc. 131, pgID 13683) (quoting Doc. 129-76, pgID 13292). Dr. Holland's reliance on that quotation, once again, distorts the record.

Dr. Kabour practiced at Toledo Cardiac Consultants and its predecessor practice beginning in 1996 or 1997. (Doc. 129-76, pgID 13281). So, the term "usually," for him, refers to a longer period than the five years that Dr. Holland practiced at St. Vincent in the 2010s. Indeed, Dr. Burdine stated in his October 18, 2013 email spelling out referral procedures that he and Dr. Hashmi had been following those same procedures prior to 2013. (Doc. 129-17, pgID 12876). He also stated that "[a]s a rule, things [we]re going well . . . ." (*Id.*).

Dr. Kabour testified that he did not refer patients to a specific St. Vincent surgeon *as of 2013*. However, some time thereafter, he "started being selective in his referrals." (*Id.*, pgID 13293). Although he was not questioned further on this point at his deposition, Dr. Kabour addressed the issue more directly in his affidavit. He stated that he had decided not to refer patients to Dr. Holland for the reasons described above. (Doc. 129-30, pgID 12911).

He also specifically addressed the issue whether he could make patient referrals to a specific surgeon, stating that:

> Dr. Holland's allegation that Dr. Andrabi and Dr. Hashmi
> could redirect and control patient consults at [St. Vincent] is
> unfounded and contrary to the consultation and referral procedure.
> Referrals are under the control of the cardiologist who is making
> the decision for the need for a cardiac intervention. . . . As
> president and chief executive officer of TCC, I am very aware of
> patient referrals by our cardiologists and have never seen or heard
> about any redirection of referrals by Drs. Andrabi or Hashmi.

(*Id.*, pgID 12912).

In addition, Dr. Burdine's 2013 memorandum regarding the treatment of patient referrals,

on which Dr. Holland relies, expressly recognized that "[r]eferring physician request [sic] will be

honored." (Doc.129-17, pgID 12876). As discussed above, each of the six cardiologists'

affidavits reflects that they made the affirmative decision not to refer cases to Dr. Holland.

Indeed, Dr. Holland relies on that fact as a significant basis for his claims.

Thus, Dr. Holland has failed to raise a genuine factual issue regarding whether referring

physicians could make surgeon-specific referrals.

### g. Whether St. Vincent Treated Similarly-Situated Physicians Differently

Dr. Holland alleges, as evidence of discriminatory intent, that St. Vincent treated Dr.

Hashmi differently than it treated him. (Doc. 131, pgID 13722-24). To establish that []he is

similarly situated to [other] employees, plaintiff must show that they are "similarly situated in

'all *relevant* respects.'" *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 353 (6th Cir.

1998) (emphasis added). Dr. Holland asserts that he and Dr. Hashmi both were cardiothoracic

surgeons and St. Vincent employees, both reported to Dr. Phillips as Medical Director and both

participated in St. Vincent's peer review and quality assurance programs. (*Id.*, pgID 13723-24).

Dr. Hashmi concedes, however, that "'the Sixth Circuit has instructed district courts to

make an independent determination as to the relevancy of a particular aspect of the plaintiff's

employment status and that of the non-protected employee.'" (*Id.*, pgID 13722) (quoting *Hunt v.*

31

*City of Youngstown Water Dep't*, No. 4:05CV1046, 2005 U.S. Dist. LEXIS 24518 at *12-13 (N.D. Ohio)).

In this case, the similarities Dr. Holland cites do not relate to the most relevant factors. They pale in significance as compared to the dissimilarities that: 1) Dr. Hashmi had an established practice at St. Vincent before Dr. Holland arrived; 2) Dr. Hashmi was a permanent member of St. Vincent's staff, while Dr. Holland was a contractor's employee whose contractor employer's contract could be terminated without cause; 3) Dr, Hashmi had established preexisting referral relationships with the Toledo Cardiac Consultant's physicians; 4) the Toledo Cardiology Consultants preferred to refer their patients to Dr. Hashmi and refused to refer them to Dr. Holland; and 5) Dr. Hashmi generated several times the number of cases for St. Vincent as Dr. Holland.

Dr. Holland was not similarly situated to Dr. Hashmi.

### h.  The Claim That Dr. Hashmi Redirected Referrals to Himself.

Central to Dr. Holland's claims is his allegation that Dr. Hashmi, as Medical Director of the practice, controlled which of the three cardiothoracic surgeons would receive a patient referral. (Doc. 131, pgID 13683-85). Once again, Dr. Holland makes allegations of misconduct without a shred of competent supporting evidence.

Dr. Holland cites to his own deposition, in which he baldly declared that "Dr. Hashmi instructed Elizabeth Sheroian, . . . to not distribute those consultations. Those consultations were to Dr. Hashmi's group and he had the right to determine who got them." (*Id.*, pgID 2296).

He also claimed that Sheroian, who was the cardiothoracic surgery practice group's Practice Manager, screened the referral calls and then lied by saying that the referring physician specifically requested Dr. Hashmi so that she could steer all referrals to him. (*Id.*, pgID 2485-86).

32

Dr. Holland's sole "evidentiary" basis for these misconduct allegations is that Dr.

Burdine and surgical assistant Adam Carruthers told him so. (*Id.* pgID 2526-27, 2485-86).[8] It is a

basic principle of summary judgment law that inadmissible hearsay cannot be used to create a

genuine factual dispute to avoid summary judgment. *See, e.g.*, *Quintanilla, supra*, 477 F. Supp.

at 836 (citing *Jacklyn, supra*, 176 F.3d at 927).

Thus, Dr. Holland has no admissible evidence to support the allegation that is the very

basis for his claims.[9]

### i. Dr. Holland's Claim That St. Vincent also Discriminated Against Three Other White Surgeons

Dr. Holland asserts that "[f]our white, U.S. born surgeons – Drs. Burdine, Brunsting

Holland and Phillips - all made complaints that referrals were being directed from one minority

cardiology group (TCC) to Dr. Hashmi without reconciliation." (Doc. 115, pgID 9363-64). Once

again he relies primarily on hearsay and his own unsupported statements as evidentiary support.

(*Id.*, pgID 13681) ("Dr. Burdine told Carruthers . . . he was not going to get referrals since all of

those went to Dr. Hashmi. . . ."); (*id.*) ("Multiple physicians and medical personnel . . . told Dr.

Holland that Dr. Brunsting left Mercy because he could not get referrals."); (*id.*, pgID 13691)

---

[8] Notably, Dr. Holland has filed excerpts from Carruthers' deposition as an exhibit, (Doc. 129-80), yet he has failed to cite any Carruthers' testimony to support his allegation. Dr. Burdine did not testify because he has passed away.

[9] Dr. Holland also alleges that "Dr. Hashmi set up a secondary system" by having referring cardiologists contact him directly, either through his cell phone or by calling into the operating room where he was working in order to circumvent the ordinary referral process. (Doc. 131, pgID 13685). This argument is much ado about nothing. Dr. Burdine's email setting out the referral procedures specified that "[r]eferring physician request [sic] will be honored." (Doc.129-17, pgID 12876). Whether the referring physicians made their request directly through Dr. Hashmi's cell phone or by calling the practice's office and requesting that Dr. Hashmi handle the referral is irrelevant.

("Carruthers testified that Drs. Burdine, Holland and Phillips all complained there were not getting referrals because of their race / national origin.").

Dr. Phillips did testify that he "had difficulty getting referrals," (Doc. 115, pgID 9363-64), and that he did not get an equal share of referrals as Dr. Hashmi, (*id.*, pgID 9348). Dr. Holland, however, has not cited to any evidence that Dr. Phillips complained about that fact or that he attributed it to discrimination by St. Vincent. Instead, Dr. Phillips expressly denied that St. Vincent distributed referrals based on a surgeon's race or national origin. (*Id.*, pgID 9515 ). He attributed the difference in referral volume between himself and Dr. Hashmi to "just friendship and nepotism" and to "relationships." (*Id.*, pgID 9515-16).

Similarly, Dr. Brunsting testified that he had never heard or seen anything that would lead him to believe that referrals for surgery were made based on a surgeon's race or national origin. (Doc. 108, pgID 7530, 7532). He also testified that he left St. Vincent for a "[b]etter job." (*Id.*, pgID 7532). He did not mention allegedly discriminatory referral practices as part of his reason for leaving.

There is no admissible evidence as to Dr. Burdine's view of the issue because he has passed away.

Thus, once again, Dr. Holland has a complete failure of proof on one of the central planks in his theory of the case.

Moreover, Dr. Holland has offered no explanation of why he believed St. Vincent had any obligation to reconcile the volume of referrals made to the three cardiothoracic surgeons by doctors who it did not employ. He also has not explained how St. Vincent could have the power to require those doctors to distribute their referrals evenly among its surgeons. The evidence, as well as common sense, indicates that it did not. *See* (Doc. 129-30, pgID 12912). If discrimination

34

played a part in referral decisions, then it was the referring doctors who discriminated; not St. Vincent.

### j.  The Argument that St. Vincent Replaced Dr. Holland with Another Pakistani Surgeon

Dr. Holland alleges that Drs. Andrabi and Hashmi conspired to replace him with another Pakistani doctor, Sulaiman Bashir Hasan. His theory is that they agreed to announce falsely that Dr. Hashmi intended to retire soon as a means to replace Dr. Holland with another Pakistani surgeon surreptitiously.[10] *See* (Doc. 131, pgID 12754).

Apart from Drs. Andrabi and Hashmi's common origins and their friendship, Dr. Holland asserts two bases for his conspiracy theory. First, he points to an email that shows, that at the same time St. Vincent was planning for Dr. Hashmi's succession, it also was considering the future of the other two cardiothoracic surgeons, himself and Dr. Phillips. (Doc. 29-9, pgID 12854). Second, he points to the fact that Dr. Hashmi did not actually retire until April 30, 2018. (Doc. 129-72, pgID 13223). Neither argument has merit.

In the late summer and fall of 2016, St. Vincent began looking for a replacement for Dr. Hashmi because he had informed them that he intended to retire in about one and one-half years. (Doc. 69, pgID 3460-61); (Doc. 129-72, pgID 13228, 13230). It was not the first time that he

---

[10] Although he has not raised a civil conspiracy claim, in his brief, Dr. Holland asserts that Drs. Andrabi and Hashmi conspired against him. *See* (Doc. 131, pgID 13710 n.4, 13712). The elements of civil conspiracy under Ohio law are "'(1) a malicious combination; (2) two or more persons; (3) injury to person or property; and (4) existence of an unlawful act independent from the actual conspiracy.'" *Aetna Cas. & Sur. Co. v. Leahey Constr. Co.*, 219 F.3d 519, 534 (6th Cir. 2000) (quoting *Universal Coach, Inc. v. New York City Transit Auth., Inc.,* 90 Ohio App.3d 284, 629 N.E.2d 28, 33 (1993)).

The only conduct Dr. Holland alleges Dr. Andrabi committed was failing to take action somehow to force independent cardiologists to distribute their referrals evenly and being  part of the executive group that approved not renewing the Services Agreement. Neither of those actions possibly could provide a basis for a conspiracy claim. Dr. Holland's inflammatory language regarding conspiracies is no substitute for evidence.

informed St. Vincent of his desire to retire soon or that St. Vincent looked for his successor. *See* (Doc. 129-72, pgID 13228).

Dr. Hashmi learned from Dr. Phillips, who was then the practice group's Medical Director, that St. Vincent was looking for another surgeon to add to the group. (*Id.*, pgID 13230). Dr. Hashmi gave Dr. Phillips the CV of another surgeon who he thought would be a suitable candidate, Dr. Hasan. (*Id.*). Dr. Hashmi told Dr. Andrabi that:

> I knew him, and he was an excellent surgeon. And that he had actually did [sic] internship at Mercy, and that he had family in the area, which actually was a family physician who used to send us cases. And also he knew a lot of physicians in Monroe area that -- that would be good for the program

(Doc. 129-72, pgID 13231).

St. Vincent's recruiter, Leeds, testified that he was tasked in 2016 with finding a successor for Dr. Hashmi. (Doc. 69, pgID 3460-61). Hood, the Director of St. Vincent's cardiovascular services line, agreed. (Doc. 67, pgID 2912-13). Hood testified that it usually took "a good two years to get us a new CT surgery group in and . . . get them ramped up"). (*Id.*, pgID 3090).

Similarly, Arquilla, who was responsible for strategic planning for St. Vincent, explained that at the time, St. Vincent was recruiting a successor to Dr. Hashmi, not Dr. Holland. He stated that St. Vincent started recruiting in 2016 because "Dr. Hashmi was considering retirement, and we were going to succession plan for Dr. Hashmi" (Doc. 64. pgID 1562-63).

Dr. Andrabi also stated that St. Vincent's search effort in the Summer of 2016 was for a successor to Dr. Hashmi, (Doc. 64, pgID 1577), and Dr. Hashmi agreed, (Doc. 129-72, pgID 13230, 13238).

Drs. Phillips and Holland objected to Dr. Hasan as an interview candidate. (Doc. 129-9, pgID 12854-55). They believed that Dr. Hasan was "too senior to be a long term investment."

36

(*Id.*). Dr. Hashmi's comment on their response was "I'll leave the decision to Imran and Tom, they can determine if they will be satisfied with the current two surgeons plus an unknown surgeon *after I am gone*." (*Id.*, pgID 12855) (emphasis added); *see also* (Doc. 69, pgID 3488-89) (Leeds testifying that Hashmi stated in his review of Dr. Hasan that Dr. Hasan was "the right person to lead our program").

The only evidence Dr. Holland has presented to rebut this consistent testimony and support his conspiracy theory are: 1) an August 23, 2016 email chain between Bertke and Andrabi, copied to Arquilla and Hood, (Doc. 129-9, pgID 12584-86); and 2) a November 12, 2016 email from Bertke to Andrabi's successor, Dempsey, (Doc. 129-10, pgID 12587).

The email chain started with Leeds passing on Drs. Phillips' and Hollands' opinions as well as Dr. Hashmi's response and asking whether he should proceed to schedule Dr. Hassan's interview.

Dr. Andrabi responded that:

> "I have already talked to this candidate and we should move forward.
>
> I am really tired of the politics.
>
> If the other two physicians don't want to be involved, then they shouldn't be. I agree with Dr. Hashmi that we need to figure out what is best for mercy health.

(Doc. 129-9, pgID 12854).

Bertke responded to Andrabi's email, stating: "[i]ronically Greg [Hood] and I met with Kabour[,] Hashmi[,] and Nahhas tonight and got alignment on what our CT group needs to be. Essentially agreement was Hashmi is the only keeper long term. We will recruit. Include above in the decisions. They are supportive of our decision." (*Id.*).

37

Bertke sent his email to Dempsey three months later at a time when St. Vincent already had determined that it did not wish to renew the Services Agreement. He again discussed the meeting that he held with Hood, Dr. Kabour, and Dr. Ahed Nahhas, as well as Dr. Hashmi "to set a go forward plan [on] (8/23)." (Doc. 129-10, pgID 12857). Dr. Nahhas of TC – Dr. Holland's employer - and Dr. Kabour of Toledo Cardiologists Consultants were the leaders of two large cardiology groups in the Toledo area. (Doc. 67, pgID 2857-58). Bertke sent the email in the context of requesting "that, before an offer is extended [to Dr. Hasan] we meet with Nahhas / Toledo Clinic and communicate our intentions." (*Id.*).

His summary of the August 23, 2016 meeting was that:

> In the past, there had been so much confusion and hard feelings when candidates were brought in that Greg and I met with Drs. Kabour, Nahhas, and Hashmi to set a go forward plan (8/23). It was agreed that Phillips and Holland would be swapped out, and the group assembled would be involved in interviewing new CT candidates. Holland and Phillips would not. It was agreed Phillips would go first, since he had minimal support among either group. We agreed to re-convene to discuss go forward with any candidates.

(*Id.*).

Dr. Hashmi reads into these two documents a sinister plot by all those involved to secretly hire another Pakistani doctor purportedly to replace Dr. Hashmi but instead, actually to replace him. Taken in context with the circumstances of Dr. Hashmi's intent to retire, however, the evidence is insufficient to raise a genuine factual issue regarding his conspiracy theory.

With Dr. Hashmi soon to retire and Dr. Holland's contract up for renewal in December 2016, it is not surprising that the business leaders of St. Vincent and St. Anne would begin making long-term plans to rebuild their three-person cardiothoracic surgery practice. It is no more surprising that in their strategic planning, they would consult with the leaders of two large cardiologist groups in the area, including Dr. Holland's employer, TC. Obviously, St. Vincent

was motivated to involve them in the decision in the hope that their practice groups would continue or expand their volume of referrals to St. Vincent and St. Anne after Dr. Hashmi retired.

Nor is it surprising or somehow nefarious that they invited Dr. Hashmi to the meeting. He had the personal relationships with the cardiologists in Drs. Kabour's and Nahhas' groups and had received their referrals in the past. It was natural and appropriate to include him in the effort to introduce a new surgeon into his relationships with them.

With neither Dr. Holland nor Dr. Phillips able to generate enough referrals independently to support their practices and without either of the two cardiologist groups supporting them, the decision that they were not "keepers long term" also was rational. Thus, the email chain Dr. Holland cites actually supports St. Vincent's first legitimate, nondiscriminatory reason for not renewing the Services Agreement.[11]

---

[11] Bertke, who Dr. Holland considered a supporter and advisor, *see* Doc. (129-47, pgID 12952-53), began his email by stating "I don't know if this will be viewed as passive aggressive, but I won't go on the record just hiring this guy (along with Holland issue) could blow things up." (Doc. 129-10, pgID 12857). Dr. Holland attempts through inuendo to argue that Bertke was referring to the possibility that he would assert an employment discrimination claim. (Doc. 131, pgID 13711). Bertke testified that he was referring to Dr. Holland's frequent complaints regarding referral volumes.

Regardless of which is correct, neither supports Dr. Holland's argument. There would be nothing nefarious about a hospital administrator raising the issue of Dr. Holland's likely volcanic reaction if the hospital hired another Pakistani surgeon at a time when Dr. Holland frequently expressed his belief that he was not getting a fair share of referrals from Middle Eastern doctors.

It was Bertke's job to protect his hospital against potential turmoil and litigation. And, the fact Bertke planned on Dr. Holland continuing to remain in his position as Medical Director at St. Anne even after the Services Agreement ended undermines any suggestion that he was motivated by discriminatory animus. (Doc. 129-10, pgID 12857)

Dr. Holland clearly believes that St. Vincent treated him unfairly. However, "[t]itle VII 'does not require employers to treat all employees fairly . . . the law limits its protection against that unfairness to cases of invidious illegal discrimination.'" *Gomez, supra,* 71 F.3d at 1086 (quoting *Ezold, supra*, 983 F.2d at 542).

The long-term strategic decision the group made during their meeting, however, did not mean that both doctors would be "swapped out" immediately. Although they decided not to renew the Services Agreement, their time for not renewing that agreement was not until December, with another ninety days' notice before the agreement would actually terminate. Clearly, finding a long-term replacement for Dr. Hashmi was the top priority, since he was responsible for bringing in the vast majority of the practice group's work.

Dr. Holland's attempted reliance on the fact that Dr. Hashmi ended up not actually retiring until April 2018 similarly is unavailing. As discussed above, St. Vincent recruiter Leeds explained that in the Summer and Fall of 2016, St. Vincent directed him to recruit a successor for Dr. Hashmi. When Dr. Holland's counsel suggested to him that he actually was recruiting replacements for Drs. Holland and Phillips instead of Dr. Hashmi, he explained that:

> "in my world, I worry about the first recruit first. This would -- I would have glazed over [the email stating that only Dr. Hashmi was a keeper long term] and had been working on the succession plan for -- for Hashmi, number one, first. Figure that out. That would have been my directive.

(Doc. 69, pgID 3474).

That Dr. Hashmi did not end up actually retiring until April 2018 is of no moment. Retirement is an important life decision that turns on a variety of personal and professional interests. Those interests, presumably, included some loyalty to the hospital and to the doctors who were referring their patients to him. Hood testified that "Dr. Hashmi was most concerned about leaving a legacy." (Doc. 67, pgID 2918).

Dr. Hashmi had spoken, as early as 2015, about retiring in the next couple years. (Doc. 63, pgID 1219-20); (Doc. 69, pgID 3474-75). That was when St. Vincent hired Dr. Phillips and made him the practices' Medical Director, replacing Dr. Hashmi in that role. (Doc. 67, pgID 2835).

However, by late 2016, Drs. Kabour and Nahhas informed St. Vincent that their practice groups did not want either Dr. Phillips or Dr. Holland to work with them on a long-term basis. Dr. Hasan had withdrawn his application. Dr. Hashmi then apparently extended his retirement date.

Given the uncontradicted testimony that in 2016, St. Vincent needed a succession plan for Dr. Hashmi and Dr. Hashmi's expressed desire to retire in the next one to two years, the fact that he ultimately delayed his retirement until 2018 means very little. St. Vincent still needed to find his successor, and a succession plan would not likely be successful if Dr. Hashmi retired immediately after they hired successor. *See* (*Id.*, pgID 3090) (Hood explaining that it takes two years to get a new cardiothoracic surgery practice up and running). Dr. Hashmi's further delaying his retirement was consistent with his expressed desire to leave a legacy at St. Vincent.

Thus, when the evidence Dr. Holland cites is viewed in context, it does not present a genuine factual issue regarding whether St. Vincent was planning in August 2016 to "swap out" Dr. Holland for a Pakistani doctor. Dr. Holland's conspiracy theory simply lacks factual support.

### 3.  Retaliation

Much like his other arguments, Dr. Holland's claim that St. Vincent retaliated against him for filing his charge of discrimination by delaying signing the Call Agreement fails for want of admissible evidentiary support. It also fails to raise a genuine factual element as to an essential element of a retaliation claim.

#### a.  No Factual Basis

Dr. Holland's purported basis for claiming that Arquilla's testimony regarding the delay is untruthful is that, although Dr. Holland and Bertke signed his Call Agreement in late-February 2017, St. Vincent did not finally execute it until early May of that year.

41

As discusses *supra* pp. 6-8, Arquilla testified regarding how his lack of authority to execute the agreement delayed it from being finalized. Hood explained the slow process through which St. Vincent approved Call Agreements. (*Id.*).

Dr. Holland challenges Arquilla's truthfulness on the ground that the legal department had put the signature line in the Call Agreement for him to sign as St. Vincent's Interim President. (Doc. 131, pgID 13696-97) (citing Doc. 129-94, pgID 13510). A paralegal being mistaken as to Arquilla's position is not particularly surprising or significant, especially coming at a time when St. Vincent's officers were making position changes. It would be much more surprising if Arquilla did not know when he stopped being Interim President.

Dr. Holland also relies on an email that a St. Vincent paralegal sent to counsel for St. Vincent's parent, Mercy Health North, responding to his confusion regarding the Call Agreement's signature dates. (*Id.*) (citing Doc. 129-94, pgID 13510). The paralegal responded that she had sent the Call Agreement to Arquilla in February 2017. (Doc. 129-94, pgID 13510). She next dealt with the agreement on May 9, when she was asked to make revisions to it. She made the requested changes on May 9 and sent it out for signature again. She received the fully signed Call Agreement on May ll. (*Id.*).

Dr. Holland asserts that the paralegal's email "do[es] not support the claim that Arquilla's name was inappropriately included, but instead that the standard procedures were followed and Arquilla simply did not sign the document." (Doc. 131, pgID 13697). This argument is meritless. Nothing about the paralegal's email conflicts with Arquilla's or Hood's testimony. Dr. Holland's attempt to assert by inuendo that Arquilla acted improperly in not executing the Call Agreement is completely baseless.

42

Dr. Holland's argument that Dr. Andrabi could have signed the agreement instead of Arquilla is no better. At the time in question, Dr. Andrabi was the president of a region that included multiple hospitals. Dr. Holland identifies no evidence that Dr. Andrabi knew of, or was asked to, sign the Call Agreement.

In addition, Dr. Holland bases his theory that St. Vincent retaliated against him for his EEOC complaint in delaying his Call Agreement on his surreptitiously recorded conversation with Bertke. In that meeting, Holland, Bertke, and the unidentified third speaker speculated about the potential impact his EEOC complaint might have on his position at St. Vincent.

That discussion might be significant to establishing a prima facie case that St. Vincent had a discriminatory motive. However, St. Vincent has shown that it did sign the Call Agreement and that Dr. Holland continued to work his call schedule without interruption during the interim.

Moreover, the transcript clearly demonstrates that Dr. Holland, the unidentified speaker, and Bertke, who undisputedly wanted to complete the Call Agreement, were speculating about the likely effects the EEOC claim might have on that agreement. *See* (Doc. 90-39, pgID 5102-26). That speculation, too, cannot raise any genuine factual issue for summary judgment purposes.

### b.  Material Adversity

In addition to not being supported by evidence, Dr. Holland's claim is defective because he has not established a genuine factual issue as to an essential element.

To give rise to a retaliation claim, an adverse employment action must be "materially adverse," which means it "must be more than simply inconvenient." *Kubik v. Central Mich. Univ. Bd. of Trs.*, 717 F. App'x 577, 583 (6th Cir. 2017). "[D]e minimis employment actions are

not materially adverse and, thus, not actionable." *Harris v. Butler Cty., Ohio ex rel. its Sheriff's Dep't*, 344 F. App'x 195, 199 (6th Cir. 2009).

Dr. Holland has failed to present any admissible evidence to support his claim that the delay in the Call Agreement was materially adverse to him. As discussed above, the evidence of record shows that he continued to perform his regular on-call work for St. Vincent and/or St. Anne. As also discussed above, he has not submitted any competent evidence, even in his own deposition testimony, that St. Vincent did not continue to pay him for that work.

Thus, Dr. Holland has failed to carry his burden to show that:1) St. Vincent's stated reasons for the delay were pretextual; and 2) he suffered any damage as a result of the delay.

That lack of evidence to support essential elements of his claim requires summary judgment.[12]

### 4.  Section 1981

Dr. Holland also asserts a claim under 42 U.S.C. § 1981. As the Sixth Circuit has explained:

> In order to maintain a claim for relief under 42 U.S.C. § 1981, plaintiff must prove that: (1) he is a member of an identifiable class of persons who are subject to discrimination based on their race; (2) the defendant intended to discriminate against him on the basis of race; and (3) the defendant' discriminatory conduct concerned one or more of the rights enumerated in § 1981 (i.e, the right to make and enforce contracts; sue and be sued; give evidence, etc.).

*Amini v. Oberlin College*, 440 F.3d 350, 358 (6th Cir. 2006).

---

[12] As Dr. Holland recognizes, "[t]he analysis for claims under the Ohio employment discrimination is identical to that for Title VII claims." (Doc. 131, pgID 13700 n.1) (citing *Gallagher v. Cont'l Airlines, Inc.*, 33 F. App'x 206 (6th Cir. 2002)). As a result, St. Vincent also is entitled to summary judgment on Dr. Holland's state-law claim.

Dr. Holland's § 1981 claim fails for the same reasons as his Title VII claim. He has failed to present any credible evidence of pretext. St. Vincent is entitled to summary judgment on this claim as well.

### 5.  Tortious Interference with Contract

Dr. Holland makes the extraordinary claim that St. Vincent tortiously interfered with his employment contract with TC "by not agreeing to continue to subsidize [his] income."

The Ohio Supreme Court has defined the elements of a tortious interference claim as: (1) the existence of a contract; (2) the wrongdoer's knowledge of the contract; (3) the wrongdoer's intentional procurement of the contract's breach; (4) lack of justification for the alleged interference; and (5) resulting damages. *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 1999-Ohio-260, 707 N.E.2d 853, 858.

Dr. Holland's tortious interference with contract claim fails because it suffers from two obvious, fatal flaws.

First, there simply has been no breach of contract. The Services Agreement gave St. Vincent the right to terminate it without cause. St. Vincent did not breach that agreement by doing so. TC never breached its contract with Dr. Holland, and he does not claim otherwise. *See* (Doc. 129-10, pgID 12857) (St. Anne's president, Bertke, stating in an email to Dempsey that "I explained [to TC's cardiologists ] Holland can stay but the Mercy/Clinic agreement will change").

Instead, of TC breaching his contract, Dr. Holland himself voluntarily resigned one year later because he was unable to generate enough business to earn a salary acceptable to him under TC's revenues-less-expenses compensation system.

Second, Dr. Holland cannot show that St. Vincent acted without justification. By the time the Services Agreement came up for renewal, Dr. Holland had failed - as his own "failure-to-subsidize" argument demonstrates – to develop an economically self-sustaining practice. "A third-party acts with justification if a party exercises its right to assert a legally protected interest in good faith." *Bridge v. Park Nat'l Bank,* 179 Ohio App.3d 761, 903 N.E.2d 702, 708 (2008) (citations omitted). "Ohio courts have approved the privilege of officers, directors, and creditors to interfere with contracts in the furtherance of their legitimate business interests." *Id.*

In not renewing the Services Agreement, St. Vincent was acting in what it reasonably believed to be its legitimate business interests. Dr. Holland's argument to the contrary is entirely meritless.

### 6.  Tortious Interference with Prospective Business Relationship

#### a.  Mercy - Cincinnati and Mercy - Buffalo

Dr. Holland claims that St. Vincent tortiously interfered with his efforts to obtain new employment with Mercy Health Physicians in Cincinnati ("Mercy - Cincinnati"). He bases his claim on the fact that St. Vincent's recruiter, Leeds, told Mercy - Cincinnati's recruiter that she should contact a Mercy attorney before interviewing Dr. Holland because he was engaged in litigation with St. Vincent. His claim is untenable.

It is well-established Ohio law that "tortious interference claims cannot lie for the dissemination of truthful information." *Richardson v. CVS Caremark Corp.*, No. 1:18 CV 1308, 2018 WL 4189522, at *3 (N.D. Ohio) (Nugent, J.); *accord Contemporary Vills, Inc. v. Hedge*, Case No. 2:05 CV 170, 2006 WL 1697634 (S.D. Ohio 2006). Truthfully telling the recruiter of a sister Mercy entity that Dr. Holland had filed a lawsuit against St. Vincent provides no basis for a claim.

Dr. Holland alleges without evidence that Leeds intended to prevent Mercy - Cincinnati from hiring him. Leeds, however, is a recruiter, not an attorney. The fact he advised Mercy - Cincinnati's recruiter to contact Mercy's legal department regarding how to proceed merely reflects that he wanted to ensure that any action regarding hiring Dr. Holland in mid-litigation was coordinated with counsel.

Lawsuits are a matter of public record. It is extremely likely that ordinary pre-hiring vetting would have revealed the action in any event. Neither Leeds nor St. Vincent owed Dr. Holland any duty of confidentiality about the fact he had filed suit. Yet again, Dr. Holland's claim is baseless.[13]

### b.  Covenant Health Care

Dr. Holland asserts that Mercy interfered with his attempt to obtain a position at Covenant Health Care by delaying providing him with his Society of Thoracic Surgeons outcome data. He claims the delay "spooked" Covenant. (Doc. 131, pgID 13742). Once again, he relies on his own speculation without a shred of support.

Instead, Covenant's representative involved in the recruitment, Eric McBride, explained in his deposition why Covenant had not extended an offer to Dr. Holland. (Doc. 114, pgID 31-32). He stated that, after Dr. Holland had visited Covenant, he had a "mixed" opinion of him because Dr. Holland "came off a bit arrogant when being interviewed." (*Id.*, pgID 9155-56).

McBride testified in his affidavit that the reason Covenant did not extend an offer to Dr. Holland was, in part, because he had "terrible references." (Doc. 126-42, pgID 12621-22). At

---

[13] Dr. Holland's brief states in the title of the relevant subsection that his claim for tortious interference with business advantage relates to Mercy - Cincinnati and Mercy - Buffalo. (Doc. 131, pgID 13741). However, he makes no substantive argument regarding Mercy - Buffalo. Accordingly, he has waived any claim as to Mercy - Buffalo. *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997).

least one of Dr. Holland's listed reference advised Covenant that Dr. Holland was "difficult to work with." (*Id.*, pgID 12621). McBride also stated that "[n]one of the references Covenant Health Care consulted and relied on to decide not to offer Dr. Holland a CTS position at Covenant Health were from Mercy Health Cincinnati, Ohio, Mercy St. Vincent Toledo, Ohio, or any of their related healthcare facilities." (*Id.*, pgID 12622).

Dr. Holland states two responses. First, he again challenges the truthfulness of the witness' testimony. Second, he again accuses opposing counsel of misconduct for obtaining McBride's affidavit through the usual and customary method.

Dr. Holland claims that there is a genuine factual issue "as to McBride's communications with Mercy." (Doc. 131, pgID 13742). He bases that claim solely on a document in which McBride wrote that he had "some final calls out to folks in Toledo." (*Id.*) (referring to Doc. 114, pgID 9168).

From this phrase, Dr. Holland speculates that the "folks in Toledo" must have been St. Vincent personnel – as opposed, for example, to Toledo cardiologists. He then hypothesizes that those unidentified St. Vincent personnel must have provided some kind of improper statements simply because Covenant did not extend him an offer. *See* (*id.*).

McBride testified, however, at deposition that the only one of Dr. Holland's references Covenant had been able to confirm had been a physician "from the South." (Doc. 114, pgID 9168). That physician gave Dr. Holland an unfavorable review. (*Id.*, pgID 9167).

The person responsible for contacting Dr. Holland's listed references was not McBride but was his colleague, Dr. Jundi. (*Id.*, pgID 9169). McBride testified that he did not recall who the "folks in Toledo" he referred to in the document were. (*Id.*, pgID 9168). He did recall that Covenant was having trouble reaching one of Dr. Holland's listed references in Toledo, a Dr.

Keith Hanpf. (*Id.*, pgId 9171). Dr. Holland has presented no evidence that Dr. Hanpf had any connection to St. Vincent, let alone that he acted improperly.

Dr. Holland relies on inuendo to suggest that some unidentified St. Vincent employee improperly dissuaded Covenant from hiring him. However, his argument regarding Mercy - Cincinnati suggests that what he really is trying to imply is that some St. Vincent employee informed Covenant that he was suing St. Vincent for discrimination. That suggestion is ironic, in light of the fact that McBride testified, with supporting documentary evidence, that Dr. Holland himself informed Covenant of his action against St. Vincent. (Doc. 114, pgID 9139). According to McBride, Dr. Holland lied, telling Covenant that "he had sued [St. Vincent] and won." (*Id.*, pgID 9138).

Dr. Holland's speculation about some unidentified St. Vincent employee who must have provided a negative reference that caused Covenant not to hire him is not evidence, and it is insufficient to meet his summary judgment burden. His reliance on McBride's reference to having calls out to "some folks from Toledo" is, at best, a basis for cross-examination at trial. It is not evidence with which he can defeat summary judgment.

St. Vincent is entitled to summary judgment on Dr. Holland's tortious interference with prospective business relations claim.

**Conclusion**

In the end, Dr. Holland's claims fail for lack of evidence to support them. He lacks evidence to show that St. Vincent acted out of discriminatory animus, that its stated reasons for not renewing the Services Agreement were pretextual, that it retaliated against him for his EEOC complaint and this action, or that it tortiously interfered with a contract or with a prospective

business opportunity. St. Vincent, therefore, is entitled to summary judgment on each of his claims.

Accordingly, it is therefore ORDERED THAT:

1. Summary judgment shall be, and the same hereby is, granted in favor of St. Vincent and against Dr. Holland on all claims; and

2. The Clerk shall mark this case closed.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge

3.